# CHARLESTON.

### STUCK v. K. & M. RAILWAY CO.

Submitted May 16, 1916.    Decided June 1, 1916.

1. TRIAL—*Instructions—Requisites.*
    Where the court in a binding instruction attempts to state a case upon which the plaintiff should recover, it must state a complete case, and embrace all the elements necessary to support a verdict. No material element upon which there is proof in the case should be ignored. (p. 497).

2. SAME—*Instructions—Singling Out Facts.*
    It is improper for the court, in instructing a jury, to single out certain facts and instruct the jury to return their verdict on such facts, when there are other facts or evidence in the case bearing on the issue and necessary to be considered by the jury. (p. 497).

3. RAILROADS—*Operation—Injuries to Persons on Track—Instructions.*
    In an instruction for personal injuries sustained by a person who was struck by a moving railroad train, it is error to instruct the jury that it is the duty of the engineer and fireman on the engine to keep a constant lookout for children that may be trespassing on the railroad track. It is only necessary that they should keep a reasonable lookout. (p. 500).

4. TRIAL—*Instructions—Inconsistency—Cure of Error.*
    Instructions to the jury should not be inconsistent. A bad binding instruction is not cured by a good one. (p. 500).

Error to Circuit Court, Kanawha County.

Action by Edward Stuck, an infant, etc., against the Kanawha & Michigan Railway Company. Judgment for plaintiff, and defendant brings error.

*Reversed, and new trial awarded.*

W. N. *King* and Leroy *Allebach,* for plaintiff in error.

Cato & *Bledsoe,* for defendant in error.

MASON, JUDGE:

This is an action to recover damages from a railway company for personal injuries. The accident which caused the injuries occurred on the 28th day of March, 1908, in the city

of Charleston. There was a trial of the case in 1911, upon which the trial court, on motion of the defendant, excluded the evidence of the plaintiff and directed a verdict for the defendant, and entered judgment thereon, from which the plaintiff brought the case to this court on writ of error. The judgment of the circuit court was reversed and a new trial awarded. *Stuck* v. *K. & M. Railway Co.,* 88 S. E. 105. Another trial was had in the circuit court, resulting in a verdict for the plaintiff for $20,000.00, judgment entered, and again brought to this court on writ of error. The injuries sustained by the plaintiff were painful and permanent, and appeal to one's sympathies. His right leg and left arm were cut off, his left leg mutilated, and his head injured. The railway company says it was guilty of no negligence causing this most unfortunate accident and should not be required to respond in damages for what it could not avoid, or for an accident to which it did not contribute. It is quite certain that the plaintiff was injured by defendant's train, but who was in fault?

The facts in brief are that plaintiff, who was then between nine and ten years old, had been playing marbles with a number of other boys on Crescent Road, a public road near the K. & M. railroad track. Plaintiff and an elder brother had started to go to their home on Bigley Avenue, a short distance from where they were playing. Crescent Road parallels the railroad and leads to their home, but it is a little farther to their home by this road than by the railroad, and the boys started to go along the railroad. It will be well to bear in mind that the accident occurred between Bigley Avenue crossing and the Crescent Road crossing. These crossings are about 2000 feet apart. Bigley Avenue crossing is above or south of where the accident occurred, and Crescent Road crossing is below or north. It was about forty feet from the point in the public road where the boys were playing marbles to the railroad track. There was a side track between the public road and the main track of the railroad, extending above and below where the accident occurred. Some railroad cars were on this side track, but where, with reference to the point on

the road where the boys were playing marbles, is a controverted and material fact.

The plaintiff and his brother Fred and Mont Spradling say that the cars were on the side track just opposite and extending above the point where they were playing marbles. True, Spradling says there were no cars on the siding where the plaintiff was injured—that he was injured some 10 or 15 feet above where the cars on the side track were. His testimony on the subject is:

"Q. Then he (the plaintiff) was not hurt between the cars, but was hurt on the Bigley end?

"A. He was hurt, I just cannot say how many feet at the other end of the cars.

"Q. At the other end, the Bigley end?

"A. At the Bigley end.

"Q. And he was not hurt then between any cars?

"A. I could not say whether he was hurt the first time, he was hurt the second time.

"Q. When you first saw him he was beyond the cars?

"A. Yes, sir.

"Q. How far beyond the cars?

"A. Well, about—I could not say exactly how far.

"Q. The length of this court room?

"A. No, sir, it was about 10 or 15 feet, I guess."

But this witness had already said that there were cars on the siding. So that from these three witnesses we learn that the cars on the siding were opposite and extending above where they were playing marbles.

Beryal Jarrett, another witness for the plaintiff, in his testimony says:

"Q. Can you locate this cut of cars which was on the side track between the point where you were playing marbles and the Crescent Road crossing of the K. & M. Railway, if there was such a cut there?

"A. Well this end of the cars was just opposite it.

"Q. When you speak of this end, that was the end nearest to Bigley Avenue?

"A. Yes, sir.

"Q. And if I understand your testimony, Eddie did not—

when Eddie left you, he did not go between the cars to the
main line, but staid on the hill side of the cars until he got
around them, is that right?

"A. Why, I didn't—the last time I seen him he was along-
side of the track walking.

"Q. You did see him cross the path from Crescent Road to
the side track, did you?

"A. Yes, sir.

"Q. And that path, is that path the lower—above the end
of the cut of cars that you say was standing there?

"A. Yes, sir, this path runs like this, (illustrating) and he
jumped from the path and went down, and the last time that
I seen him he was in the middle of the side track walking.

"Q. At a point between the side track and the main line,
in the siding?

"A. In the siding, yes, sir.

"Q. And when you saw him walking on that siding, as you
say, above the cut of cars, where was the engine of the train,
if you know?

"A. Well, it was one hundred feet or so from there.

"Q. Only a hundred feet away from him?

"A. A hundred feet or two hundred, the best that I re-
member now."

His testimony leaves it uncertain as to what he intends to
say, if anything, as to the location of the cars on the side
track, with reference to the point where the boys were playing
marbles.

In contradiction to this testimony as to the location of the
cars on the siding, Allensworth, the fireman on the train, and
Tinklepaugh, the conductor, and Harry Edwards, all say that
the cars on the side track were below where the boys were
playing.

W. C. Stalnaker, a brakeman on the train, says:

"Q. I will ask you to state to the jury what if anything
out of the ordinary occurred that you noticed between Cres-
cent Road crossing and Bigley Avenue crossing?

"A. The only thing out of the ordinary that I noticed was
a crowd of boys gathered around.

"Q. And where were you on that caboose from that point until it reached Bigley Avenue crossing?

"A. What is that?

"Q. From the point where you saw this knot of boys?

"A. I was standing on the rear of the caboose, and I stuck my head out of the door and spoke to the conductor.

"Q. And where did you say this knot of boys were standing with reference to the track?"

"A. They were standing on the main line, partly between the main line and the cross-over track, and partly on the cross-over, some running towards the crowd and some running from it.

"Q. After you informed the conductor that you thought some one might be hurt, where did you then stand?

"A. I sat on the rear of the caboose.

"Q. And which way did you look?

"A. Looking back.

"Q. I will ask you what if anything there was between Bigley Avenue crossing and this knot of boys on the side track, which would in any way interfere with your point of vision or with your view of the boys standing at that point?

"A. There was nothing.

"Q. Did you observe the condition of the side track as to whether or not there were any cars on it?

"A. I did not.

"Q. Do you know whether or not there were any cars on the side track at the point where you saw this knot of boys?

"A. There were none."

J. C. Graybill, another witness for the defendant, says: "I had been to a funeral at the Bowman Church, and when that was over, I started down the railroad home, and the hearse was passing and I got down to where some boys I thought to be were playing marbles, and they were gathered there, and looking like they were playing marbles up there, and when I passed over there my attention was attracted to them, and after I had passed them a piece, I don't think hardly 75 yards, between 50 and 75 yards, somewhere along there, I looked to see if the hearse had got across, and as I looked back, my attention was attracted to a little boy running up

the embankment, and he crossed to where the car was running, and as he got near to the car he threw up both of his hands as if to grab something, as I thought, to take hold of something; whether he took hold of something or not I do not know, but as soon as he got near to the car I seen him fall, and as I seen him fall, I seen him throw his legs and arms around as if—all of a sudden, or something, and then I walked back, but before I got back there the other little boys had got over there and had got him up and I inquired as to who he was, and they said it was Stuck's little boy. I didn't know the boy or any of the boys that was there, and that is all that I know about it, and then I turned around and went home.''

"Q. Did you notice, Mr. Graybill, whether or not there were any cars on that side of the track opposite the marble ground, between the marble ground and the point where this boy was injured?

"A. No cars between me and the boy, where the boys were playing, that is, there was no cars on the side track; I walked along the side track, I walked up and down the side track.

"Q. Where did you get on the side track?

"A. About Bigley Avenue crossing, where I always get on.

"Q. And how far did you walk on the side track, down the track?

"A. I don't remember now. There might have been empty cars standing upon the track towards Bigley crossing, up that way, there might have been, because I hadn't met the freight train yet you know, and I paid no attention to them at all, but I remember very well what I have told you.

"Q. Were there any cars on the side track if you remember, opposite the marble ground and at the point where you saw the boy running?

"A. No empties standing on the side track.

"Q. There were no loaded cars there?

"A. No loaded cars there."

In connection with the contradictory statements of the witnesses there are some physical facts not controverted which should not be overlooked. It is conceded by all that William Stuck, a brother of plaintiff, took the plaintiff from under the train after he was hurt and before all of the cars of the

train had passed. He says that he was at the place where the boys were playing, and about 60 feet from where plaintiff was hurt; that some one said, ''the train hit that boy''; ''I run over to him and pulled him out from under the train. It was my brother Eddie.'' He says it was a local freight train, ''and did not have a very long string.'' Witness Harry Edwards, who was one of the boys engaged in playing marbles at the time, says that William Stuck pulled plaintiff out from under the cars; that the train consisted of 15 or 17 cars, and plaintiff was hurt about the middle of the train; that the caboose, which we understand to be the last car of the train, was just passing when plaintiff's brother had hold of him. From these facts it would seem that plaintiff could not have been far from where he was playing, and of easy access, to enable his brother to reach him in time to remove him from the cars before the train had all passed. From these circumstances one might very readily conclude that the cars on the siding were north of where plaintiff reached the railroad and that he was not injured while standing on the right of way between the siding and the main track, with cars on the siding. But these were facts for the jury, to be considered on the question of negligence.

The plaintiff was between nine and ten years of age, and one of the witnesses said, ''For such a little fellow it seems he was awful bright''; he had lived at Bigley Avenue all his life; he was fully aware of the dangers of being on or about railroad cars when they were moving; and knew that trains passed the point where he was injured very frequently going both ways. These were questions also for the jury to consider. When this case was decided by this court before, the defendant had introduced no evidence. The fact that cars were standing on the siding and that plaintiff was caught between these cars and the moving train was not controverted by the evidence. The court decided the case upon the theory that it was ''the sudden hemming in of the plaintiff in a perilous place'' that caused the injury. Judge ROBINSON in repeating the facts in the case as it then appeared, said: ''He was caught in between one of the long string of box cars standing

on the side track and a heavy train going at the rate of thirty-five or forty miles an hour.''

But if cars were not on the siding at the point where the plaintiff was hurt, then he was not "hemmed in". He was simply a trespasser and wandered so close to the train that he was injured, and quite a different rule of law would govern. May it not be said or found by a jury, that an intelligent boy more than nine years old, who had spent all his life near a railroad and was familiar with the dangers of a train of moving cars, who deliberately walked along a railroad track for his own convenience and went so near the track that he was hurt by a passing car, was guilty of negligence? Then, when we add to these facts the testimony of witness Graybill, that he saw a little boy, who from the circumstances must have been plaintiff, "running up the embankment, crossed to where the car was running, he threw up both of his hands as if to grab something, to take hold of something", it must be conceded that there were serious questions of fact as to whether the plaintiff was caught between the cars on one side of him and a moving train on the other side, or whether or not there were any cars on the side track where plaintiff was injured, and whether or not plaintiff did not approach the train and attempt to take hold of it, as stated by witness Graybill. It is proved that the enginemen did blow the whistle and ring the bell at the Crescent Road crossing, whether plaintiff heard it or not.

Counsel for the defendant insist that with this testimony before the jury, the court erred in giving to the jury at the request of plaintiff and over defendant's objection, the following instructions:

"Plaintiff's Instruction No. 3. The court instructs the jury that if they believe from the evidence that the engineer or fireman on the train No. 44, mentioned in the evidence, saw, or by keeping a reasonable outlook could have seen, Eddie Stuck walking along the foot path close to the moving train of the defendant company, with his back to the approaching train, and that it was apparent that when said train reached the plaintiff he would be caught in the space between the swiftly moving train and a line of box cars standing on the side

track, and if they further believe that the engineer and fireman on said train gave no signal, by bell or whistle, of said train's approach, so that the plaintiff might have an opportunity to protect himself, or seek safety, before being placed in such a perilous position, these facts constitute negligence on the part of the defendant company, and they should find for the plaintiff, even though they find that plaintiff Eddie Stuck was a trespasser on defendant's right of way."

"Plaintiff's Instruction No. 4. The court instructs the jury that, according to the law of West Virginia, it is the duty of the engineer and fireman on an engine to keep a constant lookout ahead for children that may be trespassing on the railroad track, so as to avoid injury to them, if possible; and, if they neglect to do so the railroad company employing them is liable for any injury caused by their negligence."

Instruction No. 3 is composed of two clauses: one in regard to whether or not the engineer or fireman saw or by keeping a reasonable lookout could have seen plaintiff at the place where he was injured; and the other clause was in regard to the engineer or fireman giving notice of the approaching train by whistle or bell.

This is a binding instruction and undertakes to state the circumstances and conditions necessary to be considered by the jury in arriving at a verdict. It is apparent that much has been omitted from this statement essential to be considered by the jury. It must be ascertained from the evidence before returning a verdict, whether or not the plaintiff was injured while standing on the right of way with a moving train on one side and cars on the other side; whether or not the plaintiff was attempting to catch hold of the passing train; or did the enginemen give notice of the approaching train by the usual signal of whistle or ringing bell. No correct conclusion as to the negligence of the defendant could be reached without considering these matters, and yet all are ignored by this instruction. "Where the court undertakes to state a case upon which the plaintiff should recover, it must state a complete case, and embrace all the elements necessary to support a verdict." *Sun Life Assur. Co.* v. *Bailey*, 101 Va. 443. "When contributory negligence is relied on in defense of an action for wrong-

ful injury or death, a hypothetical instruction directing a finding in favor of plaintiff, which omits any reference to the facts tending to establish contributory negligence, and entirely ignores such defense, is erroneous. Nor can such error be cured by other instructions given in behalf of either party.'' *McCreery's Adm'x.* v. *Railroad Co.,* 43 W. Va. 110. ''When the court instructs the jury that if they believe, from the evidence, certain hypothetical facts mentioned in the instruction, they must find for the party plaintiff or defendant, as the case may be, but omits from such statement of facts a material fact, which being believed from the evidence, would require a different verdict, such instruction is erroneous, and, if excepted to, and not cured, is ground for reversal.'' *Ward* v. *Ward,* 47 W. Va. 766. These cases are quoted and approved in *Petry* v. *Coal Co.,* 88 S. E. 105, decided at the present term of this court. It has been repeatedly held that it is improper for the court in instructing a jury, to single out certain facts and instruct the jury that if they are true, they must find for either of the parties in accordance with such facts, when there are other facts or evidence in the case bearing on the subject.

It will be observed that Instruction No. 3 tells the jury that if they believe from the evidence that the engineer or fireman of train No. 44 mentioned in the evidence saw or by keeping a reasonable outlook could have seen Eddie Stuck walking along the foot path &c., and that the engineer or fireman gave no signal by bell or whistle &c., then the jury should find for the plaintiff. This makes the case turn on these two facts alone—ignoring all other facts. Concede that the engineer or fireman did see or could have seen the plaintiff on the track when the car struck him, yet if he did as stated by witness Graybill, and ran up to the moving train and caught hold or attempted to catch hold of it, and while so doing was injured, he could not recover, or if there were no cars on the side track and plaintiff was walking in an open space and was injured, this would be a circumstance to be considered by the jury on the question of negligence on the part of the defendant.

The second clause of the instruction tells the jury that if they believe that the engineer and fireman gave no signal by

· bell or whistle &c., then this fact, in connection with what is said in the first ·clause, entitles the plaintiff to a verdict. The proof is undisputed that the signal for approaching Crescent Road crossing was given both by whistle and ringing the bell. True, plaintiff says he did not hear them, but these signals were given according to the proof. Counsel for plaintiff seem to have based this instruction on syllabus No. 4 of this case as heretofore decided, overlooking that the evidence is quite different. When the case was tried the first time, the defendant introduced no evidence, and hence there was no attempt at that time to show that there were no cars on the siding when plaintiff was injured, or that he attempted to take hold of the train, or that the engineer and fireman did ring the bell and blow the whistle for the crossing. Instruction No. 3 was defective for the foregoing reasons.

Instruction No. 4 is erroneous because it tells the jury that it is the duty of the engineer and fireman on an engine to keep a ''constant'' lookout ahead &c. Judge ROBINSON, in delivering the opinion of the court on the former trial, said: ''Whatever may be the rule in other jurisdictions, it is settled law in this State, concerning the operation of trains, that it is the duty of those in charge of them to keep a reasonable lookout for animals and persons trespassing on the tracks. This does not mean that they are bound to keep a constant watch, but only a reasonable lookout along the track, consistent with the proper performance of their other duties in running the train.'' *Stuck* v. *K. & M. Ry. Co., supra.* True, in the third instruction the court indicated that it was only the duty of the engineer and fireman to keep a ''reasonable outlook''. But this did not cure error in Instruction No. 4. ''Instructions must not be inconsistent with each other.'' ''A bad instruction is not cured by a good one, though they may be given on the motion of adverse litigants.'' *McKelvey* v. *Railway Co.,* 35 W. Va. 500. The reason for this rule is that by inconsistent instructions the jury is left at liberty to ·decide according to the correct rule of law or the contrary and renders it impossible for the court to determine upon what legal principle the verdict was founded. It was error to give ·the. fourth instruction.

Plaintiff's instructions Nos. 5 and 6 are bad for reasons explained above. No defects in plaintiff's instructions No. 7 are pointed out, and we perceive none.

Defendant's Instruction No. 1 was a binding instruction requiring the jury to find for the defendant. There was no error in refusing to give this instruction. Defendant offered Instruction No. 2. The court refused to give it as presented, and offered to give it in a modified form. The defendant refused to have it as modified. The modification made by the court did not prejudice the defendant.

Mark Jarrett and E. W. Higginbotham were examined as witnesses on the first trial. Since that time Mark Jarrett has become insane and was, when the last trial was had, confined in an insane asylum; and Higginbotham was at the time of the present trial living in the state of Ohio, beyond the jurisdiction of the court. Plaintiff offered to introduce in evidence the testimony of each of these witnesses given on the former trial. It being proven that Jarrett was insane and that Higginbotham was beyond the jurisdiction of the court, their testimony given on the former trial was admissible on this second trial.

In defendant's eighth assignment of error, complaint is made that the court erred in permitting certain questions to be asked witnesses over defendant's objection and refused others. As this case will have to be remanded for a new trial, it becomes necessary that these exceptions should be passed upon to prevent error in another trial.

We perceive no objection to the questions asked and answered by the plaintiff, found on page 44 of the record, nor the questions and answers by Fred Stuck on page 47 of the record, nor to John Barlow on page 107. There was no error in refusing to allow witness to repeat his testimony. It was not error to refuse to allow witness I. N. Morrow to tell what the rules were on other railroads. This was not material.

The court should have permitted witness Tinklepaugh to say what the rule of the company was in regard to making inspections of trains. He had testified that he had made an inspection, and there would seem to be no reason why he should not have been permitted to tell why he made it.

In stating the case to the jury, in the opening statement, one of counsel for plaintiff said: ''I don't think there will be much controversy over the law in this case, because it has already been tried once. It has gone to the Supreme Court of Appeals of this State and the legal principles involved have been definitely and finally settled in favor of the plaintiff.'' Counsel for defendant objected to this remark, and the court instructed the jury not to consider the remark of counsel as to the law. It is not perceived how these remarks could have prejudiced defendant.

On account of the erroneous instructions given the jury at the instance of plaintiff, we reverse the judgment, set aside the verdict, and award a new trial.

*Reversed, and new trial awarded.*