# CHARLESTON.

## STATE *v.* GARNER.

Submitted September 16, 1924.    Decided September 23, 1924.

1. HOMICIDE—*Instruction that Malice Inferable From Killing With Deadly Weapon, Without Reference to Extenuating Circumstances, Held Reversible Error.*

   An instruction to the jury to the effect that malice may be inferred from the act of the accused in drawing a deadly weapon and firing it, resulting in the death of the one towards whom it was presented, and that such act is evidence of a deliberate intent to kill, without reference to any of the extenuating facts and circumstances given in evidence, constitutes reversible error. (p. 226).

   (Homicide, 30 C. J. § 599).

2. CRIMINAL LAW—*Bad Instruction Not Cured by Conflicting Good Instruction.*

   A bad instruction is not cured by a good one given to the jury, and with which it is in conflict. (p. 226).

   (Criminal Law, 16 C. J. § 2495).

   NOTE: Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.

Error to Circuit Court, Wetzel County.

Henry Garner was convicted of murder in second degree, and he brings error.

*Reversed and remanded for new trial.*

*E. H. Yost* and *Larrick & Lemon,* for plaintiff in error.
*E. T. England,* Attorney General, and *R. Dennis Steed,* Assistant Attorney General, for the State.

MILLER, JUDGE:

Upon an indictment charging him with the murder of Mont Dunham, on the —— day of July, 1923, defendant was found guilty of murder in the second degree, and the judgment complained of was that he be confined in the state penitentiary for the period of twelve years.

The material evidence adduced on the trial is substantially

without conflict. It discloses that the homicide occurred on a Sunday about noon. Defendant and deceased were near neighbors, living in the country, the deceased as a tenant on part of defendant's farm. They had been on friendly terms, except as herein after noted, up to within a very few hours of the tragedy. On the morning of the homicide, defendant, at the request of deceased, had assisted him in grinding the sickle belonging to the latter's mowing machine. After grinding it, they went to the place in the field where the mowing machine was located, near the residences of both. When deceased got down to replace the sickle in the machine, he was unable to find the bolt which he had removed in detaching the sickle from the machine, and grew very angry and accused defendant of stealing it, which defendant denied and said to him that it must be near by in the grass where deceased had left it, and proposed to get down and find it, which he did, in the grass a short distance from the place where it had been left. Mrs. Dunham says she went out to where the two men were, and when she arrived on the scene, defendant had in his hand the grass board, and her husband had in his hand a monkey wrench, but that they were not in striking distance of each other, and no blows were struck after she arrived, and that they talked about what they owed each other and other things. Defendant swore that while hunting for the bolt, deceased struck him on the head, producing a lump about the size of a hickory nut; but the evidence does not show that he resented this by any counter blow. Mrs. Dunham says she did not observe the lump on defendant's head. Defendant says that while he was still hunting for the bolt, deceased was calling him a liar and accusing him of throwing the bolt away, and that he said to him that he was a "damned son-of-a-bitch and liar," and as he started to arise, deceased hit him with the wrench; which was before Mrs. Dunham came on the scene; that he did not pick up the grass board until after Dunham had hit him with the wrench, and did not then or afterwards attempt to hit him with the board; and that after he replied to Dunham's accusation as stated, Dunham said: "I will fight you any way you want to fight;" and afterwards said: "You can run the rest of the Dunhams, but you can't run me."

After this altercation, defendant says, there was some disagreement as to where the hay was to be stacked; that deceased said he would stack it right there, defendant wanted it stacked at another point. After these transactions, defendant says he started home; and he is corroborated by Mrs. Dunham, that as he left, Dunham said to him: "Whatever you do, you do it in a sneaking way." Defendant went on home, put away his scythe, watered the horses, and then went out into the garden, from where he went up onto the porch and sat on or lay down in a swing, when he observed his wife coming up through the gate. On her arrival, she sat down in the swing with him, where they remained for a few minutes before the homicide occurred. Defendant says he told his wife about the trouble with Dunham earlier in the day, over the bolt, and about being struck by deceased with the wrench. Mrs. Garner corroborates her husband as to his having the lump on his head. She had been to church that morning. Both defendant and his wife say they had been on the porch together but a few minutes when they observed Dunham approaching from the public road; that he came out of the lane leading to the house and turned out the road in front of the house to the pasture where he had his horses. They say that as he was about to pass the house, defendant spoke to him in a friendly way, saying: "How are you, Monty." Defendant says Dunham had a very high temper; would get very angry. According to the evidence it was only about half an hour from the time the two men parted at the mowing machine until Dunham appeared in front of defendant's house. Defendant, corroborated by his wife, says that when he gave Dunham the friendly salutation, Dunham started for the front gate leading into the yard and said: "I am no better, you damned son-of-a-bitch;" and that "he started right toward me;" that at that moment defendant arose, and as Dunham grabbed back toward his hip pocket, he siezed his gun lying on the porth and said to Dunham to stay back, or stay out; that he said this two or three times after he started off the porch, and that when Dunham got to the gate, he fired the gun. The evidence shows that the gate was only about ten feet from the porch of defendant's house; and defendant says when he picked up the gun he

stepped back, and that Dunham· was coming on with his hand still on his hip, pocket, and when he fired he figured that Dunham intended to kill him or do him harm, for he had told him before on that day that he intended to kill him. Mrs. Garner, who was greatly excited, says that she ran down in the yard, held up her hands and implored Dunham to stay out, but without avail. After going down into the yard and firing the shot which resulted in the death of Dunham, defendant assisted in carrynig him into the yard in the shade, and expressed his regret at the shooting, and did what he could under the circumstances to relieve deceased. Defendant and his wife were the only living witnesses to the homicide. Both swear that the gun used by defendant was on the porch, where it had been used the night before to shoot some rabbits, and that defendant had not placed it there for any other use. Defendant admitted, on cross-examination, that he and deceased had had some little trouble before the day of the homicide; that on one occasion deceased had become very angry when defendant was at his house, apparently because he remained at the house and did not go with deceased to water his horses; that he also became angry at another time because defendant was at his house; and that on the day of the killing he made some accusations against him with reference thereto, but that defendant had never grown angry over these accusations, although he did not like them very well.

We think we have detailed sufficient of the evidence to show the application of the points relied on to reverse the judgment.

After the conclusion of the evidence, the court, at the instance of both parties, gave to the jury numerous instructions which counsel conceived were appropriate to the facts disclosed by the evidence; but some proposed on each side were refused. Some of those for each side were rather abstract, having little, if any, relevancy to the material facts proven; but there is no serious point made against the rulings thereon, except as to State's instruction number 8 given, which we will dispose of presently.

Defendant's counsel, in their brief, question generally the rejection of the instructions proposed by them, some twelve in number, but they do not rely thereon. Some nineteen in

number, covering every conceivable phase of the case, were given at their instance; and as we have suggested already, some of them were abstract, with no appreciable application to the case presented. We have examined those rejected and perceive no error in the ruling of the court thereon. They are either covered by others given, or are defective in form and substance, and without any real relevancy to the case.

The only error seriously relied on is the giving of the four instructions of the trial court, given on its own motion, and no serious objection is pointed out in any of them except instruction number 3. The Attorney General substantially concedes that this instruction is lacking in a very substantial matter, but argues that its defect, if any, is cured by instructions number 8 and 19, given for defendant. They base this contention on the proposition that instructions must be read as a whole and considered together, and if thus considered they propound the law correctly, there is no reversible error. This legal proposition is not controverted; but we have decided repeatedly, as other courts have done, that a bad instruction is not cured by the giving of a good one. 1 Cum. Sup. Enc. Dig. Va. & W. Va. Rep. 765. Among the cases cited are: *State* v. *Ringer,* 84 W. Va. 546, and *Stuck* v. *Kan. & Mich. Ry. Co.,* 76 W. Va. 453. The reason for this salutary rule is that the court can not tell which of the instructions the jury regarded, whether the good or the bad one, to the prejudice of the party affected thereby.

The court's instruction number 3, in the first paragraph, told the jury that to find deliberate intent to kill, they did not have to believe defendant had the intent in his mind a year or a month or a day or an hour; that in this age of improved weapons when a man can discharge a gun in the twinkling of an eye, if they should see a man draw one of these weapons and fire it, and the man towards whom it was presented falls dead, deliberate intent to kill is thereby manifested; that malice aforethought does not reasonably import any special spitefulness or malice toward the deceased, but includes the case of a generally depraved, wicked and malicious spirit, a heart regardless of duty and a mind deliberately bent on mischief, which imports premeditation; that malice is an intent of the mind and heart. The second

paragraph is nothing more than an attempt to restate the definition of malice, and the time limit thereof, and concludes by advising the jury if malice was wanting, the homicide could not be of a higher grade than manslaughter.

It will be observed that this instruction does not undertake to qualify the broad proposition of its first paragraph respecting malice, by reference to the facts and circumstances attending the homicide, detailed in the evidence and referred to in our brief statement of some of the material facts shown therein. It in effect told the jury they might infer malice sufficient to constitute deliberate and premeditated murder from the bare fact of the killing with a deadly weapon. Such is not the law, of this case at least. Such a proposition submitted to the jury with no reference to the extenuating circumstances, constitutes reversible error. We have so ruled in other cases, and necessarily this must be so. *State* v. *Donahue,* 79 W. Va. 260, 264, citing *State* v. *Cain,* 20 W. Va. 681, and *State* v. *Hertzog,* 55 W. Va. 74, 79-80; *State* v. *Whitt,* 96 W. Va. 268, 122 S. E. 742; *State* v. *Coleman,* 96 W. Va. 544, 123 S. E. 580. See, also, *State* v. *Best,* 91 W. Va. 559, 572.

It is true that an incomplete instruction, one which does not state the law fully, may be cured by other instructions given, and the defective one thus made whole, but a positively erroneous instruction, which may mislead the jury to the prejudice of the party affected, will not be cured by a good instruction. *State* v. *Ringer,* 84 W. Va. 546; *Stuck* v. *Kan. & Mich. Ry. Co.,* 76 W. Va. 453; 3 Cum. Sup. Enc. Dig. Va. & W. Va. Rep. 764, 765.

It is true defendant's instructions numbers 8 and 19 state correctly the elements necessary to constitute murder in the first degree, and inexcusable homicide, but as we have already pointed out, the statement of correct legal principles in one instruction will not cure a fatally defective statement of the law in another instruction. We regret to have to reverse the judgment for the error introduced by the court's instruction, but we see no way to escape it, if we adhere to the rules heretofore adopted.

The judgment will therefore be reversed, the verdict set aside, and a new trial awarded the defendant.

*Reversed and remanded for new trial.*