STATE OF WEST VIRGINIA

*v.*

JAMES HARLOW

(No. 10436)

Submitted April 22, 1952.  Decided June 3, 1952.

Lovins, Judge, dissenting.

Fox, Judge, not participating.

*D. Jackson Savage,* for plaintiff in error.

*Chauncey Browning,* Attorney General, *T. D. Kauffelt,* Assistant Attorney General, for defendant in error.

Given, Judge:

Defendant, James Harlow, was convicted of second degree murder in the fatal shooting of Carl Compton, on November 15, 1950, and sentenced to confinement in the state penitentiary, for a term of not less than five nor more than eighteen years, by the Intermediate Court of Kanawha County, that court having entered judgment on March 2, 1951. On June 29, 1951, defendant, by counsel, tendered and filed before the Circuit Court of Kanawha County his petition for a writ of error and supersedeas to the judgment of the Intermediate Court and, on July 14, 1951, the circuit court refused the writ of error and supersedeas prayed for. It is from the latter order that this Court granted a writ of error and supersedeas, on October 22, 1951.

Defendant has assigned and briefed the following six points of error, alleged to have been prejudicial:

" (1) The Court erred in refusing to set aside the verdict and grant the defendant a new trial as contrary to the law and evidence.

" (2) The Court erred in admitting certain evidence over the objection of the defendant, and in refusing to admit certain evidence of the defendant properly offered.

"(3) The Court erred in commenting to the jury on the fact that certain matters were in evidence before the jury and had been testified to by certain witnesses when, in truth and in fact, such evidence was not before the jury, and had not been testified to by any witness.

"(4) The Court erred in overruling the defendant's motion for a mistrial for improper remarks by the Prosecuting Attorney in his argument.

"(5) The Court erred in refusing to instruct the jury to disregard certain improper remarks of the Prosecuting Attorney in his closing argument before the jury.

"(6) The Court erred in reading to the jury the State's Instructions No. 2 and No. 3 and in refusing to read to the jury certain instructions offered by the defendant."

It will be observed that the assignments of error require detailed recital of the evidence.

On the afternoon and evening of November 15, 1950, defendant and the deceased, Carl Compton, were together in various places in the locality of Coal Fork, Kanawha County, where the shooting occurred. They were first observed in Eskdale, a community about three miles south of Coal Fork, about 4:00 p. m. Also present was Clyde Stover, who was wounded by the shots fired by the defendant at the time Compton was killed. While in Eskdale these three men were involved in a disturbance which will be detailed later. Defendant purchased two pints of whiskey at the state liquor store in Eskdale, and returned to Coal Fork to the home of Estill Walls, a neighbor and friend of the three principles. While at the Walls home, defendant proffered whiskey to all present, and it appears that everyone present, including Compton and Stover, took a drink of it. This occurred about 6:00 p. m. Shortly thereafter defendant went to the home of Charles Compton and found Carl Compton and Stover there, along with Thomas Compton and Charles Compton, brothers of deceased, Tom Harlow, brother of defendant, and Dorena Compton, wife of Charles Compton. Some of the male members of

the party, including defendant, his brother Tom, and Stover became engaged in what was apparently a friendly scuffle. However, in a short time, Quincy Blake, stepfather of the Comptons, arrived and ordered Tom Compton to go home with him. This occurred about 8:00 P. M. According to some of the testimony Stover became incensed at the action of Quincy Blake, and when defendant and Tom Harlow attempted to restrain him Stover struck Tom Harlow, whereupon defendant struck Stover, rendering him unconscious. It does not appear affirmatively that Carl Compton was in any wise engaged in this encounter.

Shortly thereafter defendant and Tom Harlow carried Stover out of the Charles Compton home to the Stover home nearby, where defendant left Stover and his brother on the front porch, and according to his testimony, he returned to the yard at his home where he met Everett Green, an uncle of the deceased, who transported him in his automobile along with another man to the community of Giles, where defendant remained a short time and returned about 9:00 P. M. to the Harlow home where defendant alighted. Carl Compton and Stover were at that time attempting to move a Chevrolet automobile which had stalled in a depression or ditch near the Harlow gate. According to the testimony of Green, defendant stated, after seeing Stover, "I will get out and give him a good whipping." According to defendant's testimony, when he returned with Green he was told by his brother, "Stover has got a knife and said he was going to cut your heart out with it. You had better get inside. * * * I climbed up on the bumper and over the fender and in the gate and went in the house." Later defendant left the house and walked to the gate with a twelve gauge shotgun, the magazine of which contained four shells, loaded with buckshot, and after going to the gate with the shotgun and seeing that Carl Compton and Stover had removed the car from the ditch and departed, returned to the house.

At the scene of the removal of the Chevrolet automobile from the ditch were Quincy Blake, Junior Pugh, Cloyd

Eskins, Tom Harlow and William Pettit, Jr. According to Pettit he went into the Harlow home with defendant and later went out with him to the gate to retrieve a jacket which defendant stated he had hung on the gatepost. The jacket was not there, whereupon Pettit relates that defendant stated, "If they got it I will get it from them". In so far as it can be ascertained from the record, defendant then returned to the Harlow house, took down the shotgun and went to the Walls house and from there onto the railroad right of way opposite the Wall's gate. The time was approximately 9:20 P. M. The car driven by Compton then approached and, according to the testimony of defendant, Compton and Stover "followed me to the railroad". Defendant's version of the shooting is as follows: "Q. Did either one of them say anything, and if they did, what did they say? A. Carl Compton said he would take a search warrant for me for 'packing that God domn shotgun.' I told him, 'You can't take any warrant for me. I have a license to pack it and I am going hunting.' Q. Tell the jury what happened then. A. He said, 'I have your jacket and you ain't going to get it.' I told him I didn't want the jacket and I would get it tomorrow if I needed it. Q. What else was said? A. He said, 'I ain't scared of your gun or you neither.' I told him, 'I ain't asking you to be scared of me or the gun. I don't want any trouble with you.' I told him half a dozen times to leave me alone, that I didn't want any trouble with him. Q. Was one or both of those boys present? A. Both of them. Q. Did either of them have a flashlight? A. Yes, sir. Q. Which one had the flashlight? A. Junior Stover. Q. Was either one of them armed with a weapon at that time? A. Yes, sir. Q. Which one? A. Junior Stover. Q. What kind of a weapon did he have? A. It looked like a hunting knife. Q. Which hand did he have it in? A. His right hand. Q. In which hand did he have his flashlight? A. His left hand. Q. Did you see Carl Compton have any weapon? A. Not to my knowing. Q. After you said you told him you didn't want any trouble, what else happened? A. I told them to leave me alone, that I didn't

want any trouble with them. Q. How far did you back up? A. Exactly 21 steps down the railroad. Q. How do you know it was 21 steps? A. Because I measured it after I got out. Q. Got out of where? A. Jail. Q. Were you present when it was measured? A. Yes, sir. Q. Who did the stepping? A. You did. Q. Tell the jury what happened that led up to this shooting, from where you last told about, and how it occurred. A. I told them I didn't want any trouble and they kept backing me down the road. They was between me and the light and I could see them for 'Biddy Boots' jumped at me. Q. Which one is 'Biddy Boots'? A. Carl Compton. He and Stover both jumped at me. Q. What did you do? A. I jumped back and fired one shot into the ground. Q. When did you put a shell in the chamber of your gun? A. When I was backing down the railroad track. Q. And while this conversation was going on? A. Yes, sir. Q. Go ahead. You jumped back and fired a shot into the ground? A. Yes, sir. Q. Then what happened? A. They kept coming. Q. What did you do? A. I don't know. I just emptied my gun and it was down in the road before I knew what happened. Q. Did you shoot as fast as you could? A. I guess I did. Q. How close were these boys to you when you started doing the shooting? Tell me when to stop when I get as close to you as they were when you started shooting. A. About like that. Q. About as far as you are from me at the present time? A. Yes, sir. Q. Did either one of them get hold of you? A. 'Biddy Boots' reached for the gun and I jerked it and he hit me and the gun— Carl Compton, rather. Q. You jerked it back? A. Yes, sir. Q. Why did you fire those shots, Jim? A. Because they had been threatening my life and I was afraid they were going to kill me. Q. Did you believe that shooting was necessary to protect your life or protect you from great bodily harm at that time? A. Yes, sir. Q. Where did you go after this shooting happened? A. I walked in to Estill Walls' house a minute and come back out the front door and started for home."

It will be recalled that defendant first encountered

deceased and Stover in the community of Eskdale on the afternoon of November 15, 1950. Defendant testified that previously he had agreed to take a physical examination for Carl Compton, using Compton's name, to obtain employment for Compton in the mines of Wyatt Coal Company, but that defendant had not taken the examination and Compton failed to pass it when he appeared in person. The record shows that Carl Compton's hearing was seriously impaired and that he had serious impediment of speech, the inference being that such defects would prevent his being employed in the mining industry. Defendant testified that during his encounter with deceased and Stover at Eskdale, Stover threatened to "whip" a colored boy at or near the liquor store, and that Compton and Stover taunted him with the names "coward" and "chicken" when defendant would not assist them in an attack on the unidentified colored boy. This testimony is somewhat corroborated by the testimony of John H. Saber and Nathan B. Lee, both of whom apparently had some knowledge of defendants' arrangement to take a physical examination for Compton. Saber testified that he talked to Compton in Eskdale on the afternoon of November 15, 1950, and that "he [Compton] said he would have had a job up there but Jim Harlow kept him from it and he was going to beat hell out of him." Saber did not, however, report this conversation to defendant.

It will also be recalled that about 8:00 P. M. or shortly thereafter on the same day defendant struck Stover rendering him unconscious and that defendant assisted in taking Stover to his home. A number of witnesses, including three for the State, Dorena Compton, Junior Wade Pugh, and Bertha Pettry, and nine who testified on behalf of defendant, testified, with varying detail, to having seen Stover either in possession of a knife or heard him make a threat "to kill Jim Harlow before morning". The members of the Walls family all testified that Stover came to the Walls home, which was located approximately 950 feet from the Harlow home, with a butcher knife in his hand and that he threatened Carl

Compton with the knife to force Compton to help kill defendant, and testified that Compton replied, "I will go with you and you ain't going to bother him but I will". Three witnesses, Lana Harlow, Tom Harlow and William Pettit, Jr., testified that they communicated Stover's threats to defendant, while the record is silent as to whether other witnesses who heard threats reported them to defendant.

Defendant's mother, however, testified that after defendant had returned from Giles in Everett Green's automobile and had been informed of the threats he "got his gun and went outside". She further testified that defendant stated, in conversation with Quincy Blake, who allegedly complained of Stover's conduct and that he should be "ridden out on a rail", "* * * They won't have to if he don't stay away from worrying mama." William Pettit, Jr., who was also present when defendant came out of the Harlow home with the shotgun after hearing of the Stover threat, and went with defendant to look for defendant's jacket, which defendant testified he had hung on the gatepost, testified that defendant said, with reference to the jacket, "If they got it I will get it from them." Pettit also testified that when defendant left the Harlow home with his gun immediately before the shooting defendant had stated that he was going to Everett Green's house to "get him to go hunting". Green had previously testified that he had told defendant that he was in no condition to go hunting, meaning defendant was intoxicated. Green had also testified that he had heard a "commotion" at the Harlow home prior to the homicide and that he heard defendant and his brother Tom talking; that he heard Tom tell defendant to put his gun away or he would get into trouble; that he heard defendant reply, "You go back or I will shoot you". Pettit's version of the shooting is as follows: "A. We went in the house and fooled around awhile and Jim took a notion to go hunting and started to go to Coal Fork and was aiming to go to Estill's and then to Everett's and get him to go hunting. Q. Who was there? A. Me and Jim and Tom. Q. Tell what happened.

A. We went over the hill and up through Estill Walls' yard and around the house. We met Estill Walls at his steps. Jim walked out of the gate and he was behind him. Then Carl came over and 'Bug Dust' jumped out of the car and started towards Jim. I couldn't understand what he said for he didn't talk plain but he said that 'he wasn't going to shoot anybody with that gun' or something. He come towards Jim and jumped up on the railroad and Stover was with Compton and turned around to him and Jim said, 'Don't come around up here and bother me. I don't want any trouble with you.' He kept going down and telling them not to bother him and I seen a flash of light and I heard one shot. When one shot was fired I turned around and started away from there. Q. Where were you standing when the flashlight went on? A. About at Estill Walls gate. Q. Was the light in between you and these boys? A. Yes, sir. Q. What light was there to see by? A. The only thing I seen was the car lights. Q. You were standing at the gate; were you in front of the car lights? A. Yes, sir. Q. And the lights were flashing in your direction? A. Yes, sir. Q. And in your eyes? A. Yes, sir. Q. Could you see down the railroad track clearly or not? A. No, sir. Q. Could you tell how close these people were? A. I could tell by the bulk of them; they was pretty close together. Q. Could you tell if they were facing you or had their backs around or how? A. It looked like Jim was facing me. When the light went on it was flashing in Jim's face. Q. How long after the light flashed in his face did you hear the first shot? A. Just after the light went on. Q. You say you turned and ran? A. Yes, sir. Q. Where did you run? A. To Estill Walls' house. Q. Did you hear any more shots? A. Yes, sir. Q. How many more? A. I don't know, I didn't count them. Q. How soon after the first shot were the other shots fired? A. Just a slight pause."

Junior Wade Pugh also testified that he heard defendant talking to Quincy Blake about Stover, and he answered in response to a question propounded by the prosecuting attorney as to the purport of defendant's remark: "The

way it sounded to me like, he was going to shoot Stover if he messed with him."

Bertha Pettry, a witness for the State, also was an eye-witness to the shooting and testified as to events preceding the homicide. She testified that she heard loud talking at the Harlow home shortly prior to the shooting, and that she heard defendant's mother say, "Don't do that, Jim. Don't do that." This occurred about the time defendant returned from Giles and deceased and Stover were attempting to remove the Chevrolet automobile from the ditch near the Harlow home. Her version of the shooting is as follows: "Q. What did you see and hear when you got out on your back porch? A. The racket had hushed by the time I got out on the porch and everything was quiet out there. I seen Carl Compton and 'Bug Dust' Stover come walking down the railroad track. I could see from a light that was on somebody's porch. I don't know whether it was on the Compton porch or the Estill Walls' porch. Q. Was there a car there? A. Yes, sir, there was. Q. Were there any headlights on the car or do you remember? A. I just couldn't say. Q. But there were some lights on the railroad track? A. Yes, it shown out on the railroad. Q. And you saw the Compton boy? A. Yes, sir. Q. Tell us from that point on. A. I seen them come down the railroad track. Carl Compton was in the middle of the railroad track and Mr. Stover was walking on the edge of the ties on the right-hand side as you come down. Q. That would be on the side nearest to the little road? A. Yes, sir, he was next to the road. Q. The side nearest to your house? A. Yes, sir. I seen them come down and I looked in below them and I seen the bulk of somebody that looked like he was standing in the middle of the railroad track. Q. Was it one or more than one? A. It looked like one. They walked on pretty close to this black bulk. I don't know whether it was a man or woman or what it was. I heard the Compton boy say, 'Is that a gun you got, Jim Harlow?' At least he called Jim Harlow's name. About that time the gun went off. I think the first shot I didn't see anything. The second shot I seen a flash, a real dim

flash like of a carbide lamp. It seemed like it dropped down a certain distance. The third shot it went down to the railroad and I heard somebody groan. I run back to the house and told my husband, 'Get up, there is somebody hurt.' (Objection.) Q. How many shots did you hear in all? A. I heard four. Q. How did those shots seem to you, did them seem to be like 1, 2, 3, 4? A. Three shots were fired pretty fast and the last one was a little different."

Tom Harlow, brother of defendant, testified on behalf of defendant, and since his testimony, with reference to the shooting and events immediately preceding, merely corroborates that of defendant, it would serve no useful purpose to set it forth in detail.

Clyde Stover, one of the participants in the actual shooting, testified on direct examination that he did not remember having a knife of any kind prior to the shooting, that he could not remember agreeing with the deceased to kill or injure defendant, but that he remembered going up on the railroad tracks with a flashlight, that Harlow shot him in the calf of the leg and that five buckshot pellets struck him in the back while two struck him on the front of his body. He also testified that he could not remember leaving the scene in an automobile after the shooting, nor that he had any previous "trouble" with defendant. On cross-examination Stover testified to buying whiskey with deceased in the afternoon and that thereafter he became "drunk." He denied knowing or remembering that he had been struck by defendant at the Charles Compton home or that defendant and Tom Harlow had taken him home. However, he did state that he went with deceased to the Harlow home to see defendant about some money alleged to be owing from defendant to deceased, and that the automobile in which they were riding became stuck in a drain, but could not remember the details of pushing it out. He further testified that in so far as he could remember he was on his way home and was not pursuing defendant at the time the shooting occurred.

A number of witnesses were called by defendant who testified that, in their opinion, defendant was not intoxi-

cated prior to the time of the shooting, and a state trooper testified to finding defendant's jacket and wallet in the automobile in which Stover was found wounded at about seven or seven-thirty o'clock the following morning.

After the shooting the body of Carl Compton was found lying beside the railroad tracks on the Chesapeake & Ohio Railway right of way. The county coroner testified that there were two sets of wounds upon the body, one "at the right nipple at the point of entrance" and was "an inch and a half in diameter and almost round," around which "There was a black discoloration. It looked like a powder burn or a lead burn, but you couldn't tell which; * * *." The other wound was to the left ankle about the bones of the leg. A firearms expert for the West Virginia Department of Public Safety gave as his opinion that deceased was "less than 10 feet" from the muzzle of the shotgun when it was fired.

The first assignment of error relates to defendant's contention that there is not sufficient evidence to support the finding of second degree murder. It is argued that the evidence supporting the self defense plea clearly preponderates. There can be no doubt that the evidence offered in support of the self defense plea would have justified a jury finding of not guilty, had it been believed by the jury. The credibility of witnesses, however, is purely a matter for jury determination, as has been so often announced. That rule is particularly applicable to the credibility of the witnesses in the instant case, for most, if not all, of the principal witnesses of defendant were closely related to him, and many conflicting statements and contradictions of these witnesses appear in the record. Of course any evidence supporting the verdict may also be considered as discrediting the evidence tending to support the self defense plea. Also, the burden was on the defendant to establish, by a preponderance of the evidence, that the shooting was done in self defense. *State* v. *McMillion*, 104 W. Va. 1, 138 S. E. 732.

Upon careful examination of all the evidence, we reach the conclusion that the verdict returned by the jury is

amply supported by the evidence. It will be recalled that defendant was informed of certain threats made against him by Stover and Compton at his home. After being informed of the threats, he left the house with his shotgun, with four loaded shells in the magazine, and went to the front gate of the yard of his home. Not finding Stover and Compton near the gate, as he expected, from information previously received, he went back into the house and replaced the gun in the position in which it was usually kept. A short time later he took the gun again from where he usually kept it and started toward the Wall's residence, where he knew Stover and Compton had been a good part of the evening. Before leaving his home the last time his mother cautioned him, "You ought not to go. It is dark and they are hunting for you. They may kill you." He disobeyed the warning and proceeded toward the Walls' residence. When about one hundred yards from his own home he was warned by his brother Tom: "to put his gun up, that he would get in trouble," and defendant replied to his brother, "you go back or I will shoot you," and continued on to the point where the shooting took place. Another witness, Quincy Blake, saw defendant about the time he arrived at the Walls' residence and asked defendant where he was going, to which defendant replied: "I am going to shoot 'Bug Dust' (meaning Stover) and Carl (meaning Compton) too if he fools with me." Another witness, Dorena Compton, testified to hearing Compton say to defendant just before the shooting:. "What is that you got, Jim? If that is a gun, take it home and put it up and don't shoot." Another witness, Mrs. Bertha Pettry, testified to seeing Stover and Compton walking down the railroad track and that she saw a "black bulk" on the track and heard Compton say, "Is that a gun you got, Jim Harlow? * * *. About that time the gun went off." A number of witnesses heard the defendant make serious threats toward Stover and Compton on the evening of the homicide.

From this evidence the jury had the right to find that defendant, knowing of the threats made against him by

Stover and Compton, deliberately took his gun from his home, with four loaded shells therein, and traveled approximately nine hundred and fifty feet from his home to the area where he knew Stover and Compton would likely be. He also knew of the quarreling and prior trouble in the Walls' residence within that area. Three times before reaching the point of the shooting he was warned against appearing on the scene with a gun, and was requested to take it home and put it up. Disregarding all such advice, he persisted in doing what the jury had a right to believe he intended to do, and what he had previously announced he would do, shoot Stover and Compton. The jury, moreover, could have believed, from the testimony of Mrs. Pettry, that defendant was waiting on the railroad tracks for the appearance of Stover and Compton just before the shooting and, from the testimony of other witnesses, that the shooting took place after Compton had pleaded with defendant, "If that is a gun, take it home and put it up and don't shoot." In this proof no necessary element of murder in the second degree is lacking. See *State* v. *Morrison,* 49 W. Va. 210, 38 S. E. 481.

Defendant's second point of error relates to the following excerpt from the record, the questions being asked the defendant by the prosecuting attorney: "Q. After you were brought to the jail by the sheriff and put in the jail and before Corporal Whitman and Trooper Trivett and Chief Green talked with you, you had counsel, did you not? Objection; overruled; exception. Q. You had already talked with a lawyer before you saw those officers, had you not? A. Yes, sir. Q. You did talk with those officers, however, did you not, over at the county jail? A. Yes, sir. Q. And you refused to make a written statement to those officers because your counsel had told you not to, and which was your right? Objection; sustained." The contention of defendant here appears to be that the State was attempting to create an inference to the effect that the "only reason the defendant did not break down and confess was due to the fact that his counsel advised him not so to do." There is no merit in the contention. The de-

fendant made no answer to the questions objected to and no prejudice to defendant's rights could possibly have resulted. Code, 57-3-6, provides that where a defendant takes the stand voluntarily, and testifies in his own behalf, he shall "be deemed to have waived his privilege of not giving evidence against himself and shall be subject to cross-examination as any other witness." See *Forney* v. *Ferrell*, 4 W. Va. 729; 5 Jones on Evidence, 2d Ed., page 4665.

Defendant's third assignment of error relates to statements of the trial judge during the course of the trial. Darlene Walls, a witness for the defendant, had been asked on cross-examination as to a statement made by her to Sam Whitman, one of the investigating officers, to the effect that after the shooting she heard defendant say he knew he had killed Stover and that William Pettit, Jr. replied: "I know you did too because I saw Junior fall." The witness denied making the statement and Whitman was put back on the stand and asked the following question, "Q. She testified she did not say, in answer to the question, 'Did Jim come in your house after the shooting?' Quite awhile after the shooting, Jim and Bill Pettit came to our house. Jim said, 'I know I killed those two boys.' Bill said, 'I know you did too because I saw Junior fall.' Dad told them no, that the boys were in the house after the shooting. He told them this to quiet Jim's nerves. Did she make that statement?", to which he answered, "Yes, sir." Counsel then moved to strike the last quoted question "as it is a collateral matter." The court then stated to the jury: "Gentlemen of the jury, the testimony of this witness goes to the credibility of the little girl and not to the guilt or innocence of the accused. However that statement is in the record by other witnesses and does not apply to the testimony of the other witnesses." Thereupon counsel for defendant announced, "I take exception to the Court's statement and move it be stricken from the record." The motion was overruled and counsel excepted. The contention of defendant goes to the remarks of the court, not to its action in instructing the jury that the testimony went only to the credibility of Darlene Walls.

Perhaps it would have been better had the added remarks of the trial judge not been made. Trial courts should always be on guard against any statement or action which would indicate an opinion as to the credibility of a witness. This, of course, often results in a very delicate situation for a trial judge, for it is entirely proper for courts to advise counsel of the basis of any ruling upon a matter to which an objection has been made. We think it clear in the instant case, however, that no prejudice to defendant's rights is shown. *State* v. *Smith,* 119 W. Va. 347, 193 S. E. 573; *State* v. *Rush,* 108 W. Va. 254, 150 S. E. 740.

Defendant's fourth and fifth assignments of error relate to certain remarks of the prosecuting attorney, made in the course of his final argument to the jury, it being contended that the remarks were not justified by the evidence, and of such inflammatory nature as to have prejudiced the minds of the jury. We do not consider these assignments for the reason that there was no objection made to the statements at the time they were made. Objections were not made and motion to instruct the jury was not indicated until after instructions offered by the parties had been considered by the court and after final arguments of counsel had been completed. *State* v. *Lewis,* 133 W. Va. 584, 57 S. E. 2d 513; *State* v. *Files,* 125 W. Va. 243, 24 S. E. 2d 233.

We are not to be understood as indicating that an objection to every inflammatory or other unwarranted and prejudicial argument is required to be made before the same can be considered on appeal. It may be, in some circumstances, that the argument will prove so inflammatory or otherwise unwarranted and prejudicial as to be beyond the power of the court to correct at the time, by instruction or otherwise. It is sufficient to say that the statements complained of here clearly do not fall within such a class. The fact that a prosecuting attorney, as a representative of the State, is under a duty not to convict regardless of guilt, but to assist in affording a defendant charged with crime a fair and impartial trial, would neces-

sarily have to be considered when such a question arises. See *State* v. *Graham,* 119 W. Va. 85, 191 S. E. 884.

The last assignment of error relates to State's Instructions Nos. 2 and 3. No contention is made in defendant's brief as to any supposed error in the giving of No. 2, and we find no prejudicial error in the giving of that instruction. Instruction No. 3 told the jury that if they believed from the evidence, beyond a reasonable doubt, that defendant shot and killed Compton and that Harlow relied upon self defense, the burden of showing such defense was on Harlow and that such defense must be proved to the satisfaction of the jury by a preponderance of the evidence; that it must appear from all the evidence and circumstances in the case that Harlow, at the time of shooting and killing Compton, believed, and had reasonable grounds to believe, that he was in imminent danger of death or great bodily harm at the hands of Compton and that he shot and killed Compton for the purpose of protecting himself from such apparent danger, and that Harlow believed, and had reasonable grounds to believe, that the shooting was necessary to protect himself from death or great bodily harm at the hands of Compton, but that Harlow acted at his peril, and that the jury must pass upon all Harlow's actions in the premises, from all the facts and circumstances in the case. The contention of defendant is that the instruction is erroneous, in that it should have told the jury that if defendant was threatened by Stover and Compton, either or both, or acting together, that Harlow was under apprehension that either or both of them would kill him or do him great bodily harm, that he, Harlow, had the right to shoot either Compton or Stover, or both. The State's contention is that the instruction is not erroneous, but merely an incomplete instruction; that in so far as it instructs the jury with reference to Compton, it is correct, and that the incompleteness was remedied by defendant's Instruction No. 21 given to the jury. It is not questioned that defendant's Instruction No. 21 properly informed the jury of defendant's right to defend himself against both Compton and Stover, or

against either. We must, therefore, decide only whether State's Instruction No. 3 was erroneous or merely incomplete and, if merely incomplete, whether the giving of the complete instruction cured any error resulting from the giving of the incomplete one. The State does not contend, of course, that an error in giving to the jury an erroneous instruction, as distinguished from an incomplete instruction, may be cured by the giving of a correct one.

We are of the opinion that the questions posed are fully settled by the decisions in *State* v. *DeBoard,* 119 W. Va. 396, 194 S. E. 349; *State* v. *Garner,* 97 W. Va. 222, 124 S. E. 681; *State* v. *Ringer,* 84 W. Va. 546, 100 S. E. 413; *State* v. *Prater,* 52 W. Va. 132, 43 S. E. 230. State's Instruction No. 5 given in the *DeBoard* case was subject to the same vice as that charged against State's Instruction No. 3 in the instant case. In discussing the alleged error in the *DeBoard* case in Instruction No. 5, page 408 of the West Virginia Report, the Court concluded: "With the assertion that the instruction is not full and complete, we concur. But the instruction must not be appraised alone. It must be read in conjunction with defendant's instructions wherein we find that the jury was fully and fairly informed as to the defendant's right of self-defense against any and all menacing individuals." In the *Garner* case this Court stated: "It is true that an incomplete instruction, one which does not state the law fully, may be cured by other instructions given, and the defective one thus made whole, but a positively erroneous instruction, which may mislead the jury to the prejudice of the party affected, will not be cured by a good instruction. *State* v. *Ringer,* 84 W. Va. 546; *Stuck* v. *Kan.* & *Mich. Ry. Co.,* 76 W. Va. 453; 3 Cum. Sup. Enc. Dig. Va. & W. Va. Rep. 764, 765." In the *Ringer* case, at page 551, West Virginia Report, we find this language: "Defendant's instruction number four is substantially the instruction approved in *State* v. *Staley,* but as a general rule a bad instruction is not cured by the giving of a good one. *Cobb* v. *Dunlevie,* 63 W. Va. 398; *State* v. *Michael,* 74 W. Va. 613, 621; *Stuck* v. *K.* & *M. Ry. Co.,* 78 W. Va. 490. The instruction does not represent an

incomplete statement of the law which, under authority cited by counsel, may be cured by another complete instruction, but propounds a proposition which is not law, and is not cured by another instruction propounding the law correctly." Point 7 in the *Prater* case holds: "When an instruction given is incomplete, but states the law correctly as far as it goes, and the omitted part is supplied by other instructions given, such omission is not error." See also *State* v. *Cobb*, 122 W. Va. 97, 7 S. E. 2d 443; *State* v. *Long*, 88 W. Va. 669, 108 S. E. 279; *State* v. *Snider*, 81 W. Va. 522, 94 S. E. 981; *Bank* v. *Lowry Co.*, 81 W. Va. 578, 94 S. E. 985; *Jaeger* v. *Railway Co.*, 72 W. Va. 307, 78 S. E. 59; *Styles* v. *Railway Co.*, 62 W. Va. 650, 59 S. E. 609; *State* v. *Clifford*, 59 W. Va. 1, 52 S. E. 981; *State* v. *Kellison*, 56 W. Va. 690, 47 S. E. 166; 10 M. J., Instructions, Section 47; 53 Am. Jur., Trial, Section 546.

We think the above authorities make it clear that State's Instruction No. 3 in the instant case was an incomplete instruction, not an erroneous one. What it told the jury was precise and correct. True, it did not inform the jury as to a principle of law which the defendant was entitled to have the jury know, but that was done precisely and correctly by defendant's Instruction No. 21. The instructions given should be read as a whole. It is not necessary or required in this jurisdiction to inform the jury of every applicable principle in a single instruction. State's Instruction No. 3 being merely an incomplete one, and the incompleteness thereof having been remedied by defendant's Instruction No. 21, the defendant could not have been prejudiced in any manner.

Finding no prejudicial error, the judgments of the Circuit Court of Kanawha County and of the Intermediate Court of Kanawha County are affirmed.

*Affirmed.*

Lovins, Judge, dissenting:

The first, second, third and fourth points of the syllabus correctly state the applicable principles of law, but I

do not agree that the fifth point of the syllabus is sound in statement or correct in application, and, therefore, the action of the trial court in giving State's Instruction No. 3, in my opinion, constitutes reversible error and for that reason, I dissent.

State's Instruction No. 3 reads as follows: "The Court instructs the jury that if you believe from the evidence in this case, beyond a reasonable doubt, the prisoner, James Harlow, shot and killed Carl Compton, *and that he, the said James Harlow, shot and killed Carl Compton,* [*sic*] and that he, the said James Harlow, relies upon self-defense to excuse him from such act, the burden of showing such excuse is on the defendant, and to avail him, such defense must be proved to the satisfaction of the jury by a preponderance of the evidence, and it must appear from all the evidence and circumstances in the case that, at the time he shot and killed the said Carl Compton, he believed and had reasonable grounds to believe, that he was in imminent danger of death or great bodily harm at the hands of the said Carl Compton and that he shot and killed the said Carl Compton for the purpose of protecting himself from such apparent danger, believing and having reasonable grounds to believe, at the time he shot and killed the said Carl Compton that said shooting was necessary in order to protect himself from death or great bodily harm at the hands of the said Carl Compton, but the Court instruct the jury that the prisoner acted at his peril, as the jury must pass upon all his actions in the premises and from all the facts and circumstances in the case."

An analysis of that instruction clearly shows that it is in two parts; first, the statement of the facts submitted to the jury for their belief or disbelief, and second, a statement of applicable law. The characterization of that instruction as an incomplete instruction will not bear analysis and the fallacy of such characterization appears upon examination of the record in this case.

Throughout the entire record it is undoubtedly shown

that the decedent, Compton, and his companion, Stover, were actuated by anger against Harlow, the defendant, and that Compton and Stover were acting in concert. Just before and at the time of the fatal encounter, Compton and Stover were hostile to defendant and were threatening him. It is true, as stated in the opinion of the court, that the giving of an incomplete instruction is not "ordinarily" grounds for reversal if the point was correctly covered by another instruction.

The case of *State* v. *DeBoard*, 119 W. Va. 396, 194 S. E. 349, is authority for that holding. But is the instruction here considered incomplete or erroneous?

If you start from the premise that it is an erroneous instruction, there is ample authority that the error arising from the giving of such erroneous instruction is not cured by the court giving another instruction which is correct. *State* v. *Garner*, 97 W. Va. 222, 124 S. E. 681; *State* v. *Ringer*, 84 W. Va. 546, 100 S. E. 413; *Cobb* v. *Dunlevie*, 63 W. Va. 398, 60 S. E. 384.

My views differ for the reason that I think the instruction here considered is erroneous. Certainly it is contrary to the evidence in the record which shows that Compton, the decedent, was not alone in making the attack upon the defendant. Therefore the factual statement in the instruction is erroneous.

It is reasonable to assume that a person who is attacked by two or more persons bent on inflicting death or great bodily harm on him would be in greater fear than when he is attacked by one person only.

State's Instruction No. 3 above quoted and the defendant's Instruction No. 21, in my opinion, are contradictory. Defendant's Instruction No. 21 presents a clear statement of the correct factual hypothesis and the principles of law applicable thereto. On the contrary, State's Instruction No. 3 presents a false factual hypothesis.

Moreover, in my opinion, the opinion of this court in *State* v. *DeBoard, supra,* is subject to criticism. In the case of *State* v. *Manns,* 48 W. Va. 480, 37 S. E. 613, this

court held in point 3 of the syllabus as follows: "Instructions not justified by the evidence and tending to mislead the jury should not be given"; and in syllabus 4, as follows: "Instructions which do not fully state the law on a given point are erroneous and should not be given, as they tend to mislead the jury." So far as I have been able to ascertain the foregoing points of the syllabus in the *Manns* case have not been disapproved, modified or overruled. See *State* v. *Shamblin,* 105 W. Va. 520, 143 S. E. 230; *State* v. *Dickey,* 46 W. Va. 319, 33 S. E. 231.

The case of *State* v. *DeBoard, supra,* may be authority for the holding of this court, but it is to be noted that the opinion in that case on the point here discussed cites no authority and seems to be in conflict with the holding of this court in the *Manns* case.

If the State's Instruction No. 3 is incomplete as to a statement of law as distinguished from a statement of fact, I think it is the law that an incomplete statement of law may be corrected by a correct statement contained in another instruction, but State's Instruction No. 3 does not state the facts correctly. If the facts stated in that instruction were borne out by the record, and it were established that only one person, to-wit, Compton, assailed Harlow, then the State's Instruction No. 3 would be a full, complete and correct instruction.

For the foregoing reasons, I dissent and would reverse the judgment of the Intermediate and Circuit Courts of Kanawha County.