Argued and submitted on May 17, 2007, remanded for resentencing; otherwise affirmed May 7, petition for review denied August 6, 2008 (345 Or 175)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# KEVIN MITCHELL BUMGARNER,
*Defendant-Appellant.*

Douglas County Circuit Court
03CR1425FE; A126264

184 P3d 1143

J. Michael Alexander argued the cause for appellant. With him on the briefs was Swanson, Lathen, Alexander & McCann, PC.

Paul L. Smith, Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers,

Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General.

Before Wollheim, Presiding Judge, and Armstrong and Sercombe, Judges.

SERCOMBE, J.

**SERCOMBE, J.**

This is a criminal case in which defendant was convicted of a number of sex crimes involving a four-year-old child. On appeal, defendant makes five assignments of error, four of which relate to his convictions and one of which relates to his sentence. For the reasons explained below, we affirm defendant's convictions, but remand for resentencing.

On a hot day in mid-August 2003, defendant, his daughter, and several members of his ex-wife's family gathered at a family member's house. Among the people present were the son and daughter of defendant's former brother-in-law, N and the victim, respectively.

Early in the afternoon, the group decided to go swimming in a local river and have a barbecue. They took several vehicles. The four-year-old victim and her 10-year-old brother N rode with defendant in his truck. The truck had a bench seat and a standard transmission with a shifter on the floor. N sat by the passenger-side window, and the victim sat between N and defendant.

After defendant left with the children, there was some confusion about the exact location where the group would reconvene, and defendant drove down a number of roads that led toward the river, looking for the others. Defendant had been drinking beer earlier, and he continued to drink during the drive. N testified that defendant, while going down the roads, hit a pole and a tree, and backed into another tree. According to the victim, when defendant hit a tree, she was thrown hard into the gear shift. Each time they went a short way down those roads, defendant asked N to get out of the truck to look for the rest of the group. N testified that the victim appeared to be content when he left the truck, but would then be crying when he returned. N also testified that, while they all were in the truck, defendant kept reaching up the victim's dress and touching her on her upper thigh, "where her underwear was." After trying in vain to find the rest of the family for two to three hours, defendant took the children to his house.

Meanwhile, other family members were concerned that defendant and the children had not shown up. According to defendant's daughter, "my dad had been drinking [and family members] were realizing, oh, my God, you know, the kids are with him, he's not here, he's been drinking. You know, they were a little concerned." Eventually, defendant's son's girlfriend called defendant's house from a telephone at a ranger station. When she got off the telephone, having confirmed that defendant was at his house and that he had the children with him, she was concerned. "She said that [defendant] was being weird." Defendant's daughter and defendant's former brother-in-law went to defendant's house to get the children.

Defendant had a pool at his house that was partially filled with water and inhabited by water spiders and other insects. N testified that, after defendant took them to his house, he and the victim were by the pool looking at the insects when defendant came out of the house, first in a grey T-shirt and underwear and a short time later in a T-shirt with nothing else on. N testified that defendant then took the victim into the house, leading her by the hand.[1] A few minutes later, N heard the victim screaming. N testified, "I knew she was getting hurt because she never screamed like that before. I've heard her throw a fit, and like I've heard her cry because she got hurt, and it wasn't like that. It was really, really bad." After hearing his sister scream for five minutes, N went into the house, where he encountered defendant, emerging from his bedroom. Defendant obscured the doorway so that N could not see into the bedroom. Defendant returned to the bedroom, closing and locking the door.

N pounded on the closed door, as the victim continued to scream from inside the bedroom. Defendant told N (through the closed door) that the victim was all right, but that she had been scratched by his cat. Defendant also said that he wanted the victim to take a bath, but that she didn't want to. N testified, "I knew that those were excuses because

---

[1] In a slightly different version, N told a sheriff's deputy and a detective that defendant grabbed the victim by the waist and picked her up, taking her into the house. He told the deputy that the victim was struggling to get away and that she did not want to go with defendant.

I'd never heard her scream before like that." N tried to open the door to the bedroom, but he could not move the handle. Meanwhile, the victim was screaming, "I'm in here" and "Help me." N found a telephone and tried to dial 9-1-1, but he could not get the telephone to work. N then went to the next-door neighbor's house, who called police.

Deputies Koberstein and Pariani responded to the emergency call at about 5:00 p.m. They went first to the neighbor's house, where they encountered N, who was, according to Koberstein, "traumatized, he was upset." Koberstein testified that N "was absolutely sure that his sister was in pain and hurting. She had been screaming for her daddy from behind a locked bedroom door." The deputies then went to defendant's house. As they arrived, they encountered defendant, dressed only in a tank top and with a partially erect penis. As the deputies approached the house, defendant retreated into the house, ignoring commands to get down on the floor. Based on defendant's furtive behavior—repeatedly glancing toward a closed box—Koberstein was concerned that defendant might reach for a weapon. Koberstein therefore "rushed" defendant and forced him onto the floor. In fact, Koberstein later found a loaded Glock pistol lying behind the box. Throughout the encounter, the deputies could hear a child crying or whimpering in the background.

With defendant subdued, Koberstein went to the victim, who was wearing a sundress and underpants and was curled up in a fetal position on a recliner, dirty and sweaty. Koberstein testified, "[I]n her eyes I saw a fear that—that I've only seen maybe once or twice in accident victims where children have been involved in car accidents and that kind of thing. She was severely, severely traumatized." When Koberstein asked the victim what had happened, she replied, "He had sex with me." Meanwhile, defendant was talking and "spouting off." Koberstein told him to be quiet, because his voice was traumatizing the victim. As Koberstein explained, "Every time he would say anything I could see her cringe, her fear return to her eyes again." While Koberstein and Pariani were processing defendant and the scene, defendant's telephone rang. When Koberstein went to answer it, he discovered that it was covered in a greasy, colorless substance. N testified that, when he had earlier attempted to use

the telephone, it had been clean. Police later found an open jar of Vaseline in defendant's bedroom.

After defendant was placed in the patrol car, Koberstein asked the victim again what had happened. She responded that defendant had touched her where she did not want to be touched, pointing to her upper right thigh. The victim told Koberstein that defendant had taken her into the back room, despite the fact that she did not want to go there. She told Koberstein that she wanted to go with her brother, but that defendant would not let her. Koberstein testified:

> "She said he grabbed her and indicated to me by her body movements that she was being held down around her waist, her midsection, and that she was on a bed. [The victim] said to me, 'He had sex with me.' I asked [the victim] what she meant by that and she said, he was rude to me. I asked her where he'd been rude to her and asked her if she could show me, and she took me, my hand, and led me to the back bedroom * * *.

> "She then led me into the living room and pointed to the same brown chair that I found her in in the fetal position when we arrived."

The deputy did not see any bruising or red marks on the victim's body.

Defendant's daughter and the victim's father (defendant's former brother-in-law) arrived at the scene. Defendant's daughter asked the victim what had happened. The victim replied, "That man tried to have sex with me." Although defendant's daughter saw no bruises on the victim that day, she saw "hand-print" sized bruises "all over" her the following day. The victim's father also asked the victim what had happened and, he testified, "I thought that she said he had sex with me." The next day, when he went to bathe the victim, her father noted bruising on her buttocks. "To me," he testified, "they looked like fingerprints on her buttocks."

Defendant, after donning blue jeans, was taken to the Douglas County Jail. He was initially placed in a cell that had a grate in the floor where an arrestee could urinate; there was some water around the grate that could be scooped out. Because he became combative when placed in the cell,

defendant was placed in leg restraints. Defendant tried to take water from the area of the grate and put it on his face. At that point, he was placed in wrist restraints in addition to the leg restraints. Defendant then asked to use a toilet, so he was placed in another cell, one that had a toilet and a sink. Once in that cell, defendant tried to take water from the toilet and wash his genitals.

The victim was taken to Mercy Medical Center, where she was examined by Dr. Smith, a physician in the emergency department who had specialized training in sexual assault recognition. The examination revealed that the victim had a tear on the outside of her right labia, a tear just inside the left labia, and a lot of swelling of the left labia; she was in pain at the time of the examination. The victim also had a lengthy tear "right through the posterior fourchette going into an area called the fos navicularis, which is in between the labia and the hymen * * *." There was blood coming from the posterior fourchette. Smith testified that the injuries he observed were consistent with penetration by a finger or a penis. Smith testified that one of the tears "is a classic tear for penetrating vaginal trauma." Smith explained that the examination in this case is one of few in his career that he will never forget. According to him,

> "on the vast majority of the sexual assault exams that we do, you leave the room and it's really up in the air, you really don't know whether something happened or not. You don't really have an impression one way or another. You've collected the evidence and you'll see where the evidence falls in terms of ultimate findings. When I left the room in this case, I felt, which I feel very rarely, that this girl had been raped."

Detective Angie Borigo, who was present for the examination, testified, "I'm not medically trained but, like I said, I was present and I observed [the victim's] vagina to be torn and bleeding."

The Mercy Medical Center sexual assault nurse testified about the victim's interview and examination at the hospital. Borigo asked the victim what had happened that day, and she stated, "I was having sex." When asked what sex is, the victim replied, "I don't know." The victim stated that

defendant had had his pants off and that he had lain on top of her. She told the examiners that she had been yelling for her brother and, when asked where she was when that occurred, she stated, "In his bed, and he kept covering my mouth, and I was kicking him." The victim stated that defendant kept taking her panties off. When asked how her "coochie"[2] got hurt, the victim stated that defendant had touched it too hard, that he was lying on top of her, and sometimes beside her, and he was touching her "coochie." The victim's panties, which had blood stains on them, were seized as evidence.

Several days later, the victim was examined at the Douglas County CARES facility. The CARES medical examination was consistent with the examination performed at Mercy Medical Center. The CARES physician, Dr. Hollander, testified that her "diagnostic impression was that [the victim's] genital exam revealed signs of recent, acute penetrating genital trauma." Hollander testified that "this case was one of the most definite clear cases of sexual assault [that she could] recall." Hollander also testified, in response to the prosecutor's question, that the injuries she observed could not have been caused by the victim being thrown into a gearshift like the one in defendant's truck. Rather, she stated, the injury was a penetrating injury consistent with having been penetrated by a finger or a penis.

The CARES evaluation also involved a lengthy interview of the victim. The state introduced a videotape and transcript of that interview; defendant stipulated to the admissibility of those exhibits. In addition, Borigo, who was one of the interviewers, testified about the CARES interview. Generally, the information obtained from that interview was consistent with the facts recounted above.

Rhonda Banks, a forensic scientist employed by the Oregon State Police Forensic Laboratory, testified about the physical evidence in this case. Banks testified that she had received the victim's underwear and hairs that were collected

---

[2] The victim consistently referred to her genitals as her "coochie." Although the victim preferred that term, her parents had taken pains to explain human anatomy and sexuality to the victim, employing books like "Where Do I Come From?" The victim was familiar enough with the word "sex" to describe the sex act.

from them. Banks testified that, following a microscopic comparison with pubic hair standards received from defendant, she determined that one of hairs obtained from the victim's underwear was consistent with the pubic hair standard received from defendant. Susan Hormann, a criminalist and DNA expert with the Oregon State Police Crime Laboratory in Portland, also testified. She stated that a penile swab obtained from defendant tested positive for blood. Hormann tested samples from the zipper area of defendant's jeans. She discovered a mixture of DNA, some of which came from defendant and some of which "could not be excluded" as coming from the victim. Hormann also tested the victim's underwear, again discovering a mixture of DNA, some of which was consistent with having come from defendant.

Defendant was charged with two counts of first-degree rape, two counts of first-degree unlawful sexual penetration, two counts of first-degree sexual abuse, two counts of first-degree kidnapping, one count of third-degree assault, and two controlled substances offenses (which later were dismissed). Pretrial, defendant moved for a competency hearing regarding the victim. As part of that hearing, defendant sought to introduce evidence that the victim's testimony was "tainted" by investigators' use of improper interviewing techniques. Defendant asserted that the claimed taint rendered the victim incompetent to testify.

The trial court held the competency hearing but, despite lengthy arguments to the contrary, determined that evidence of improper questioning was not relevant to the competency determination. Nonetheless, the trial court allowed the defense expert witness to testify regarding the claimed deficiencies in the interviews as an offer of proof. The trial court ultimately found the victim competent.

At trial, the evidence recounted above was elicited. Although the victim—who was five years old at the time of trial—testified, her testimony was ambiguous and vague. The most coherent portions of the victim's testimony included the following statements:

"Q. You don't remember riding in [defendant's] truck?

"A. But I remember he gave them drinks and he been bad.

"Q.   He gave you drinks and he was bad?

"A.   Uh-huh (affirmative).

"Q.   Okay. And what did he do when he was bad?

"A.   He was on his bed and he was having sex.

"Q.   Okay. Did he touch you anywhere?

"A.   On my coochie.

"Q.   On your coochie. When he touched your coochie, did it feel, what, did you get an owee on your coochie?

"A.   It was bleeding.

"Q.   It was bleeding. Okay. Do you know what part of— what parts—do you remember did he touch your leg anywhere?

"A.   No.

"* * * * *

"A.   He was just laying on me.

"Q.   He was just laying on you? And is that when you got the owee on your coochie?

"A.   Yeah.

"* * * * *

"Q.   When—did you have your clothes on or did you have your clothes off?

"A.   On.

"Q.   Okay. And did you have—did you have underwear on, or did you have underwear off?

"A.   On.

"* * * * *

"Q.   * * * Do you remember what happened—do you remember what happened after you were screaming?

"A.   I [was] yelling [to N].

"Q.   And then what happened?

"A.   And then the bad guy was just—and then the bad guy was covering my mouth.

"Q. Okay. And then what happened?

"A. He—[N] called the police.

"* * * * *

"Q. * * * Do you remember—well, you said you got an owee on your coochie when you were on the bed?

"A. Yes. 'Cause he was sticking his finger in it.

"* * * * *

"Q. What happened when he was laying on you?

"A. He hurt my coochie."

It is important to emphasize that the testimony just set out is culled from 14 pages of trial transcript. Other portions of the victim's testimony—including some that was interspersed with the testimony set out above—was inconsistent, nonresponsive, or simply confusing.

In addition, at trial, defendant introduced extensive expert testimony regarding the adequacy of the interviewing techniques used with the victim. The expert—the same witness who had testified during the offer of proof at the competency hearing—testified that the interview techniques were "coercive," "the worst [he had] ever seen." The state countered with its own expert, who testified that, although the interview of the victim was not "perfect," it was appropriate and fell within applicable guidelines. As noted, the jury ultimately found defendant guilty of each of the sex crimes with which he was charged.

On appeal, defendant makes three assignments of error relating to the propriety of admitting the victim's out-of-court statements and testimony. First, he asserts, the trial court erred, "when considering the alleged victim's ability to testify, by failing to consider whether her memory had been so tainted by suggestive pre-trial questioning as to make her [testimony] unreliable and therefore inadmissible." Second, he claims that the trial court erred "by allowing the alleged victim to testify." Finally, he argues, the trial court erred "by admitting out-of-court statements by the alleged victim." We consider each assignment in turn.

■     In addressing defendant's arguments regarding the victim's competency, we begin with the Oregon Evidence Code. OEC 601 provides, "Except as provided in [OEC 601] to [OEC 606], any person who, having organs of sense can perceive, and perceiving can make known the perception to others, may be a witness." OEC 602 provides:

> "Subject to the provisions of [OEC 703], a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness."

As we recently stated in *State v. Sullivan*, 217 Or App 208, 212, 174 P3d 1095 (2007), "[t]he rule 'establishes a liberal standard for competency of witnesses.'" (Quoting Laird C. Kirkpatrick, *Oregon Evidence* § 601.03(1), Art VI (4th ed 2002).)

> "A competent witness need only be able to recognize the necessity of telling the truth, to have personal knowledge and recollection of the relevant events, and be able to communicate that knowledge to the jury. *State v. Lantz*, 44 Or App 695, 700, 607 P2d 197, *rev den*, 289 Or 275 (1980). Whether a person who has the ability to perceive and recount an event will do so accurately and truthfully 'is to be tested by cross-examination and not by a motion to disqualify the witness as incompetent.' *Id.*"

*Sullivan*, 217 Or App at 212. We review a trial court's determination of witness competency for an abuse of discretion. *Id.*

Here, the trial court allowed the prosecutor and defense counsel to question the victim. In response to their questions, the victim established that she was five years old, that she knew her colors, that she could tell the difference between the truth and a lie, that she knew the parts of the human body, that she knew she was in a courtroom, that she knew she was in Oregon, and that she remembered what had happened on the day of the crimes. Defense counsel then sought to have the expert, Daly, testify about the alleged deficiencies in the interview conducted at the CARES facility. The prosecutor objected to Daly's testimony, and a colloquy

ensued during which the court and counsel discussed the propriety of Daly's testimony.

Referring to Professor Kirkpatrick's evidence treatise, the court pointed out, "Before allowing a witness to testify the trial Judge need only make a preliminary determination that there is evidence sufficient to support a finding that the witness has personal knowledge. * * * So my sense of what you're doing is that you're addressing this to the wrong person." The court reiterated to defense counsel that she "ought to be doing this to a jury instead of me * * *." The court continued:

> "[I]t is not my role to say by preponderance or by clear and convincing evidence or beyond a reasonable doubt that the person has personal knowledge or that the person is telling the truth. All I'm being asked to do at a competency hearing is to decide conditionally, is there evidence from which the trier of fact could find that this person has knowledge. Then it's up to the trier of fact to make the analysis that you're making."

The trial court ruled that the victim was competent to testify.

As noted, on appeal, defendant contends that the trial court erred in not considering expert evidence that the victim's memory was "tainted" by improper interview techniques. Defendant does not make a focused argument suggesting that the trial court abused its discretion in applying the Oregon Evidence Code.[3] Rather, defendant relies primarily on the New Jersey Supreme Court's decision in *State v. Michaels*, 136 NJ 299, 642 A2d 1372 (1994), to support his position.

In *Michaels*, "a nursery school teacher was convicted of bizarre acts of sexual abuse against many of the children who had been entrusted to her care." *Id.* at 303, 642 A2d at 1374. At issue before the New Jersey Supreme Court was whether, when there are allegations that the state used improper techniques in interviewing child witnesses, a trial

---

[3] Defendant does not contend that the court erred under OEC 602 in making a preliminary determination that there was evidence to support a finding that the victim had personal knowledge of defendant's actions toward her. Defendant did not object to the victim's testimony under OEC 403 (exclusion of relevant evidence if its probative value is outweighed by the danger of misleading the jury).

court must hold a pretrial "taint" hearing. The court explained:

> "The focus of this case is on the manner in which the State conducted its investigatory interviews of the children. In particular, the Court is asked to consider whether the interview techniques employed by the state could have undermined the reliability of the children's statements and subsequent testimony, to the point that a hearing should be held to determine whether either form of evidence should be admitted at re-trial."

*Id.* at 306, 642 A2d at 1375. The court concluded that a "sufficient consensus exists within the academic, professional, and law enforcement communities" to warrant the conclusion that the use of "highly suggestive interrogation techniques" can create a "significant risk" that the interrogation itself will distort the child witness's recollection of events, "thereby undermining the reliability of the statements and subsequent testimony concerning such events." *Id.* at 312, 642 A2d at 1379.

Based on that conclusion, the court called for the use of what since has become known as a "taint" hearing. Under *Michaels*, if a defendant can produce "some evidence" that the state employed coercive and unduly suggestive methods of questioning, "a hearing must be held to determine whether those clearly improper interrogations so infected the ability of the children to recall the alleged abusive events that their pretrial statements and in-court testimony based on that recollection are unreliable and should not be admitted into evidence." *Id.* at 315-16, 320, 642 A2d at 1380-81, 1383.

Although it recognized that "assessing reliability as a predicate to the admission of in-court testimony is a somewhat extraordinary step," *id.* at 316, 642 A2d at 1381, the *Michaels* court analogized the coercive child interviewing issue to United States Supreme Court cases addressing the use of eyewitness identifications in court, *see, e.g., Manson v. Brathwaite*, 432 US 98, 97 S Ct 2243, 53 L Ed 2d 140 (1977) (authorizing hearing to determine admissibility of in-court identification testimony because of pretrial suggestiveness); *Jackson v. Denno*, 378 US 368, 84 S Ct 1774, 12 L Ed 2d 908 (1964) (same). The *Michaels* court explained:

"The law governing the admissibility of eye-witness identification testimony provides a helpful perspective in addressing the concerns at issue here. The United States Supreme Court has insisted that a pretrial hearing be held to determine the reliability and admissibility of proffered in-court testimony based on unduly suggestive identification procedures."

136 NJ at 318, 642 A2d at 1381. Both the *Michaels* court's imposition of a taint hearing requirement and the Supreme Court's eyewitness identification cases are grounded in due process considerations. *Id.* at 316, 642 A2d at 1380; *Manson*, 432 US at 113.

Under *Michaels*, once a defendant establishes that sufficient evidence of unreliability exists, "the burden shall shift to the State to prove the reliability of the proffered statements and testimony by clear and convincing evidence." *Id.* at 321, 642 A2d at 1383. Thus, the court explained that

"the ultimate determination to be made is whether, despite the presence of some suggestive or coercive interview techniques, when considering the totality of circumstances surrounding the interviews, the statements or testimony retain a degree of reliability sufficient to outweigh the effects of the improper interview techniques."

*Id.* If, following the pretrial taint hearing, the trial court determines that the testimony is admissible, the defendant still may present expert testimony "to aid the jury by explaining the coercive or suggestive propensities of the interviewing techniques employed * * *." *Id.* at 323, 642 A2d at 1384.

The *Michaels* approach has received a mixed reception among the federal courts and the courts of other states. *See generally* John E. B. Myers, *Taint Hearings for Child Witnesses? A Step in the Wrong Direction*, 46 Baylor L Rev 873 (1994); Julie A. Jablonski, *Where Has Michaels Taken Us?: Assessing the Future of Taint Hearings*, 3 Suffolk J Trial & App Advoc 49 (1998). Some courts have enthusiastically adopted the *Michaels* approach. In *Commonwealth v. Delbridge*, 578 Pa 641, 663-64, 855 A2d 27, 39-41 (2003), for example, the Pennsylvania Supreme Court concluded that "taint is a matter properly examined during a competency determination as it goes to the question of whether the child

has the memory capacity to retain an independent recollection of the occurrence." *See also English v. State*, 982 P2d 139, 146-47 (Wyo 1999) (declining to adopt a separate pretrial taint procedure, but holding that existing statutory competency hearing would allow evidence of taint); *Matter of Dependency of A. E. P.*, 135 Wash 2d 208, 956 P2d 297 (1998) (same).

Other courts have rejected *Michaels*. In *People v. Montoya*, 149 Cal App 4th 1139, 1149, 57 Cal Rptr 3d 770 (2007), for example, a California Court of Appeal rejected *Michaels*, stating:

> "Appellant cites no authority and we can find none that approves or requires *Michaels*-style taint hearings in California. Like other states, we reject *Michaels* in favor of our well-established competency jurisprudence. * * * The relevant determination in California is whether a minor victim is competent to testify."

The court explained, "The capacity to perceive and recollect is a condition for the admissibility of a witness's testimony on a certain matter, rather than a prerequisite for the witness's competency." *Id.* at 1150; *see also State v. Olah*, 146 Ohio App 3d 586, 591-92, 767 NE 2d 755, 759-60 (2001) ("No Ohio appellate court has either followed *Michaels* or independently determined that a pretrial taint hearing is required if a child witness is potentially contaminated."); *United States v. Geiss*, 30 MJ 678, 681 (1990) ("[W]e hold that evidence of suggestive questioning or coercive pretrial interviews goes to the credibility of a witness rather than to the admissibility of testimony.").

We, too, reject the *Michaels* approach, for three reasons. First, as the *Michaels* court explained, its creation of a taint hearing procedure to determine the competency of child witnesses was based on the United States Supreme Court's eyewitness identification jurisprudence. Yet, neither that Court nor the Oregon Supreme Court has extended the need for a pretrial determination of reliability for due process purposes beyond the narrow setting of eyewitness identification. *See State v. Classen*, 285 Or 221, 590 P2d 1198 (1979) (citing United States Supreme Court cases on exclusion of improperly obtained eyewitness identifications). We see no reason to

accord a second category of evidence the extraordinary treatment that courts have given to eyewitness identification testimony. Indeed, even the *Michaels* court described its extension of eyewitness identification principles into the child witness area as "extraordinary." *Cf. Rock v. Arkansas*, 483 US 44, 61, 107 S Ct 2704, 97 L Ed 2d 37 (1987) (in rejecting state rule that barred defendant's posthypnosis testimony in all cases, Court noted that "[a] State's legitimate interest in barring unreliable evidence does not extend to *per se* exclusions that may be reliable in any individual case").

Second, the *Michaels* court conflated the competency of the witness with the reliability of potential testimony that the witness might give. As noted above, *Michaels* rests on an analogy to tainted eyewitness testimony. Yet, even in that context, the court gave special treatment to a type of evidence, not a type of witness. Whether a *category of evidence* is so unreliable that its admission would violate due process is a different question from whether a *witness* meets the very liberal standards for competency that the evidence code (and due process) contemplates. Even if some of a witness's testimony could have been affected by the use of improper interviewing techniques, it does not follow that the witness—in all respects—cannot testify truthfully, cannot recall events, or cannot relate them. The United States Supreme Court has never suggested that evidence of taint is relevant to witness competency.

■■ Finally, we believe that the trier of fact, rather than the judge, is in the best position to determine the effect, if any, of improper interviewing techniques on a witness's credibility. It is axiomatic that determination of witness credibility is normally for the trier of fact and, as we said in *Lantz*,

> "[w]hether a person, who has the ability to perceive an event, recall it and relate the recollection will tell the truth is to be tested by cross-examination and not by a motion to disqualify the witness as incompetent. The competency inquiry should be made with a view to the preference toward allowing the trier of fact to be the ultimate judge of the quality of the evidence."

44 Or App at 700; *see also Manson*, 432 US at 116 ("We are content to rely upon the good sense and judgment

of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill."); *Equitable Life Assurance v. McKay*, 306 Or 493, 498, 760 P2d 871 (1988) ("Ferreting out and discounting biased testimony is treated as a question of believability for the jury, not admissibility for the court."); *State v. King*, 84 Or App 165, 176, 733 P2d 472, *rev den*, 303 Or 455 (1987) (testimony of hypnotized witness is admissible; "the issue is the weight to be given the testimony, not its admissibility"). Here, defendant introduced extensive expert testimony regarding the claimed deficiencies in the CARES interview, and the jury was able to take that testimony into account in evaluating the victim's in-court and out-of-court statements. Due process requires no more.

■     In sum, we hold that evidence of improper interviewing techniques is not admissible in a pretrial competency hearing. Rather, that evidence—assuming it meets other requirements for admissibility—is properly presented to the trier of fact.

In his second assignment of error, defendant asserts that the trial court erred "by allowing the alleged victim to testify." Defendant admits that his second assignment of error "essentially restates the argument in support of the need for a 'reliability' hearing." We agree. Defendant asserts that the claim addressed in his second assignment of error was preserved by his pretrial motion to allow a "taint" hearing as part of the victim's competency hearing. Thus, defendant's second assignment of error does not relate to any trial court ruling separate and apart from his first assignment of error; it simply restates his assertion that the victim was not competent to testify. Because the trial court did not abuse its discretion in determining the victim's competency, and it properly refused to consider evidence of "taint," we reject defendant's second assignment of error.

Defendant's third assignment of error presents a different twist on his "taint" arguments. After the state rested its case-in-chief, defense counsel again raised the issue of the unreliability of the victim's statements, focusing on her out-of-court statements:

"[DEFENSE COUNSEL]: Your Honor, I think what we need to do right now is first of all visit again the taint issues here now that we've had the evidence in, and I would move to strike all out of court statements at this point because they were so poorly done and unreliable—

"THE COURT: What would be—

"[DEFENSE COUNSEL]: —based on the memo that we did during the competency hearing."

The trial court denied the motion.

In his third assignment of error, defendant asserts that the "trial court erred by admitting out-of-court statements by the alleged victim." He argues that the assignment involves "an evidentiary question under our code, as well as alleged violation of Defendant's Constitutional right to Confrontation, and right to Due Process because of the suggestive nature of the interviews that were conducted." (Footnotes omitted.) Defendant argues that, because of the alleged taint, the victim was "unavailable" both for purposes of OEC 803(18a)(b) and the Confrontation Clause of the Sixth Amendment to the United States Constitution, each of which requires that a witness be available before her out-of-court statements may be admitted. Thus, according to defendant, even though the victim testified at trial and was subject to cross-examination, she nonetheless was unavailable due to "taint," and her out-of-court statements should have been stricken.

■ We reject defendant's Confrontation Clause claim.[4] The following discussion in *Sullivan* fully answers defendant's argument:

---

[4] Defendant's objection under the Oregon Evidence Code was not preserved. Defendant's counsel stated that the objection was not based on "any Oregon authority." As noted, defendant argued to the trial court that his motion to strike all of the victim's out-of-court statements was based on his pretrial written memorandum in support of his motion for a competency hearing. In the submitted memorandum, although defendant mentioned OEC 803(18a)(b), he never made any argument about availability and confrontation. To be sure, that subject came up during a colloquy at the competency hearing, but defendant purported to rely only on his pretrial memorandum in support of his motion to strike the victim's out-of-court statements. Thus, we do not reach any issue of whether OEC 803(18a)(b) uses a different and broader standard for determining the "availability" of a witness than the standard used under the Sixth Amendment or Article I, section 11, of the Oregon Constitution.

"Under Article I, section 11, of the Oregon Constitution, a determination that a witness is 'unavailable' is 'not applicable in instances where the declarant is available to testify and be cross-examined.' *State v. Rumary*, 173 Or App 219, 221, 21 P3d 166 (2001). Similarly, the Sixth Amendment's Confrontation Clause has been held to 'guarantee[ ] only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' *Delaware v. Fensterer*, 474 US 15, 20, 106 S Ct 292, 88 L Ed 2d 15 (1985) (emphasis in original). It contains

" 'no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose those infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.'

"*Id.* at 21-22, 106 S Ct 292. *See also United States v. Owens*, 484 US 554, 559-64, 108 S Ct 838, 98 L Ed 2d 951 (1988) (Confrontation Clause is not violated by admitting testimony of witness who identified the defendant but who was 'unable, because of a memory loss, to testify concerning the basis for the identification.').

"In this case, defendant was given a full and fair opportunity to cross-examine the victim about her testimony and about her lack of memory about certain specifics and then to argue that, because of the nature of her answers, 'scant weight' should be given to the testimony. *Fensterer*, 474 US at 20."

217 Or App at 213. Because the victim was subject to cross-examination by defense counsel and was, in fact, cross-examined, she was available, and the trial court correctly refused to strike her out-of-court statements.[5]

---

[5] Defendant's third assignment of error suffers from a second preservation problem. Much of defendant's complaints about the victim's out-of-court statements relates to the interview conducted at CARES. Although defendant's expert half-heartedly suggested that the emergency room interview and even Koberstein's and the family members' initial questions to the victim were somehow coercive, his real criticism was of the CARES interview. But, as noted above, defendant stipulated to the admissibility of the videotape of the interview and transcript of the interview. Many of the victim's other out-of-court statements were nontestimonial and not subject to defendant's confrontation rights.

■ In his fourth assignment of error, defendant claims that the trial court erred in denying his motion for a midtrial continuance. At trial, the victim testified that, when they were riding in defendant's truck, defendant ran into a tree and she hurt her "coochie." She stated that she was hurt "['c]ause of the thing that was inside of me." She testified that she went forward and hit something "real hard." About a week later, when defendant testified, he suggested that the victim could have suffered her injuries by having been thrown into his gearshift after the gearshift knob had fallen off.

Shortly after defendant testified, defense counsel filed a motion seeking to have the gearshift tested "for blood as well as any DNA sampling and testing thereof." The motion was supported by a defense counsel affidavit. In the affidavit, defense counsel averred that she had consulted a DNA expert who told her that,

> "[i]f [the victim] is saying that the stick shift went inside of her (or if it made direct contact with her avoiding her underwear) yes, it is possible that DNA could have transferred onto [the] stick shift or possibly the knob when it was put back on. If the stick shift did not actually contact [the victim] directly and only contacted her underwear, you would probably not find any DNA because the underwear would have acted as a barrier between [the victim] and the stick shift."

Defense counsel asserted that the testing could be done on a rush basis in about five days. The trial court denied the motion.

■ We review rulings on motions for continuance for abuse of discretion. *State v. Wolfer*, 241 Or 15, 17, 403 P2d 715 (1965); *State v. Hug*, 186 Or App 569, 572, 64 P3d 1173, *rev den*, 335 Or 510 (2003). Moreover, such a ruling "will not be overturned unless there is shown to be an abuse of discretion and prejudice to [the] defendant." *State v. Schroeder*, 62 Or App 331, 339, 661 P2d 111, *rev den*, 295 Or 161 (1983). Here, as explained below, there was neither an abuse of discretion nor prejudice to defendant.

■ As an initial matter, the trial court properly could have denied the motion solely on the basis that it was not

timely. Defendant became aware of the facts that would have supported his new theory that the victim's injuries could have been caused by the gearshift a week before he moved for the continuance. And, when he finally did move for a continuance, it was the day before the lengthy trial was to conclude. Had defendant moved for the continuance on the day that the information came to light, the testing could have been completed before the scheduled end of the trial. In determining whether to grant a motion for a continuance, a trial court properly may take into account "the need of the public and of all defendants for expedition in the court system." *Hug*, 186 Or App at 572-73. Here, defendant offered no explanation for waiting a week to move for a continuance and, had the court granted the motion, it would have significantly delayed completion of the trial.

In any event, in light of all the evidence adduced at trial, defendant cannot demonstrate that the denial of his motion for a continuance to have the gearshift tested prejudiced him. As set out above, all of the physical evidence was inconsistent with defendant's gearshift theory. For example, when the prosecutor asked Hollander, the CARES physician, if sliding into the gearshift could have caused the victim's injuries, she unequivocally responded, "No." Similarly, Smith, the emergency room physician, testified that the injuries constituted "the classic finding for sexual assault" and that they could not be explained by a straddle injury. Smith testified that he had never seen injuries like those suffered by the victim "in anybody except for somebody who had sexual abuse." Finally, a detective who examined defendant's truck testified that the gearshift knob was intact and tight when he examined it.

In short, because of the tardiness of defendant's motion to continue and because it was extremely unlikely that granting the continuance would have benefitted defendant, we cannot say that the trial court abused its discretion in denying the motion.

We turn to defendant's final assignment of error. Defendant challenges the trial court's imposition of consecutive sentences based on judicial factfinding, arguing that *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed

2d 435 (2000), and *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004), require that facts pertaining to the imposition of consecutive sentences must be found by a jury. In *State v. Ice*, 343 Or 248, 170 P3d 1049 (2007), *cert granted*, ____ US ____ , 128 S Ct 1657 (2008), decided after briefing and argument in this case, the Oregon Supreme Court agreed. Accordingly, we must remand for resentencing.

Remanded for resentencing; otherwise affirmed.