696 S.E.2d 8

**STATE of West Virginia, Plaintiff Below, Appellee**

**v.**

**Darrell Eugene SMITH, Defendant Below, Appellant.**

**No. 35133.**

Supreme Court of Appeals of West Virginia.

Submitted March 3, 2010.

Decided May 6, 2010.

Gregory L. Ayers, Esq., Deputy Public Defender, Matthew D. Brummond, Esq., As-sistant Public Defender, Charleston, WV, for Appellant.

Darrell V. McGraw, Jr., Esq., Attorney General, Robert D. Goldberg, Esq., Assistant Attorney General, Charleston, WV, for Appellee.

WORKMAN, Justice:

This case is before the Court upon an appeal of the November 13, 2008, order of the Circuit Court of Kanawha County which sentenced the appellant, Darrell Eugene Smith, to thirty to sixty years in the State penitentiary following his conviction by a jury of five counts of sexual abuse by a custodian and two counts of first degree sexual abuse. In this appeal, the appellant argues that the circuit court erred by not conducting a pretrial taint hearing regarding the testimony of the two victims, the appellant's granddaughters. The appellant also contends that the circuit court erred by not granting a mistrial based upon the alleged improper admission of evidence by the State in violation of Rule 404(b) of the West Virginia Rules of Evidence. The appellant seeks reversal of the circuit court's order and a remand of the case to the circuit court for a new trial. Based upon the parties' briefs and arguments in this proceeding, as well as the relevant statutory and case law, this Court is of the opinion that the circuit court did not commit reversible error and accordingly, affirm the decision below.

## I.

### FACTS

The appellant, Darrell Eugene Smith, was tried and convicted in the Kanawha County Circuit Court for sexually abusing his two granddaughters, B.S. and N.S.[1] At the time the sexual abuse began, B.S. was eleven years old and N.S. was fourteen years old, while the appellant was sixty years old. At trial, B.S. testified that the abuse occurred every other weekend for approximately two years. She explained that she had not reported the abuse during that time because

---

1. Our customary practice in cases involving minors is to refer to the children by their initials rather than by their full names. *See, e.g., In re* *Cesar L.,* 221 W.Va. 249, 252 n. 1, 654 S.E.2d 373, 376 n. 1 (2007).

she was afraid of the appellant. She testified that the appellant touched her vagina and breasts with his hands and that he placed her hand on his penis. These incidents occurred in the appellant's bedroom.

The allegations of sexual abuse first surfaced when B.S. told a friend of hers about the appellant's conduct after that friend had told her about experiencing a similar situation with her own father. B.S. testified that the last time the appellant sexually abused her was two weeks prior to telling her friend about it. B.S. said that her friend told her that she needed to speak with an adult about the actions of the appellant. Thereafter, B.S. approached her school counselor, who, upon hearing about B.S.'s allegations, set up a meeting with B.S.'s mother Anita S. and the school principal.

Upon hearing B.S.'s revelations, Anita S. approached her older daughter, N.S., and asked her if anything had happened between her and the appellant. N.S. told her that the appellant had molested her during weekend sleepovers at his home. At trial, N.S. testified that the appellant repeatedly touched her breasts and vagina which he penetrated with his finger. She said that these acts occurred when she was between twelve and fourteen years old. She also testified that the appellant forced her to touch his penis with both hands and her mouth and that he would ejaculate on her face.

On November 7, 2005, B.S. and N.S. were interviewed by a Child Protective Services ("CPS") worker, Jeff Sprouse. Two months later both B.S. and her sister were inter-

viewed by Dunbar Police Sergeant W.M. Moss. Subsequently, the appellant was indicted on June 7, 2007, and charged with six counts of sexual abuse by a custodian and six counts of sexual abuse in the first degree. In addition to B.S. and N.S., their younger sister, A.S., was also named as a victim. However, prior to trial, the two counts of the indictment involving A.S., were dismissed by the State.

At trial, the appellant denied the allegations of sexual abuse. He presented numerous witnesses to state that N.S. and B.S. lived in a "sexually-charged home environment" with their parents who paid little attention to their five children, but paid an "inordinate amount of attention to sexuality." The appellant argued that it was against this backdrop that the charges of abuse against him resulted. He further contended that Anita S., the victims' mother and his daughter-in-law, had a motive to press the charges against him due to the fact that he had offered to pay for his son, John S., to divorce her after several years of marital problems. During rebuttal testimony, however, John S. testified that while his father had made such an offer, he only did so on one occasion years before the allegations of sexual abuse were made.[2]

The appellant's trial lasted two days and on July 24, 2008, he was convicted of five counts of sexual abuse by a custodian pursuant to W.Va.Code § 61–8D–5 (2005),[3] and two counts of first degree sexual abuse under

---

**2.** The State also presented testimony from Robert Love, who attended church with the appellant. Mr. Love testified that the appellant was complaining to him that he had spent all of his money on lawyers and that he did not know why the prosecution was continuing against him because his granddaughters had forgiven him for his actions against them.

**3.** West Virginia Code § 61–8D–5, in part, provides:

(a) In addition to any other offenses set forth in this code, the Legislature hereby declares a separate and distinct offense under this subsection, as follows: If any parent, guardian or custodian of or other person in a position of trust in relation to a child under his or her care, custody or control, shall engage in or attempt to engage in sexual exploitation of, or

in sexual intercourse, sexual intrusion or sexual contact with, a child under his or her care, custody or control, notwithstanding the fact that the child may have willingly participated in such conduct, or the fact that the child may have consented to such conduct or the fact that the child may have suffered no apparent physical injury or mental or emotional injury as a result of such conduct, then such parent, guardian, custodian or person in a position of trust shall be guilty of a felony and, upon conviction thereof, shall be imprisoned in the penitentiary not less than ten nor more than twenty years, or fined not less than five hundred nor more than five thousand dollars and imprisoned in the penitentiary not less than ten years nor more than twenty years.

W.Va.Code § 61–8B–7(a)(1) (2006).[4] By order entered November 13, 2008, the circuit court sentenced the appellant to thirty to sixty years in the state penitentiary. This appeal followed.

## II.

### STANDARD OF REVIEW

■ As noted above, the appellant assigns as error the circuit court's failure to hold a pretrial taint hearing with regard to the testimony of his granddaughters. "This Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" Syllabus Point 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996). "Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review." Syllabus Point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995).

With regard to the appellant's second assignment of error regarding the circuit court's denial of his motion for a mistrial, this Court has stated that "[t]he decision to grant or deny a motion for mistrial is reviewed under an abuse of discretion standard." *State v. Lowery,* 222 W.Va. 284, 288, 664 S.E.2d 169, 173 (2008). In *State v. Williams,* 172 W.Va. 295, 305 S.E.2d 251 (1983), this Court explained that:

The decision to declare a mistrial, discharge the jury and order a new trial in a criminal case is a matter within the sound discretion of the trial court. A trial court is empowered to exercise this discretion only when there is a 'manifest necessity' for discharging the jury before it has rendered its verdict. This power of the trial court must be exercised wisely; absent the existence of manifest necessity, a trial court's discharge of the jury without rendering a verdict has the effect of an acquit-

tal of the accused and gives rise to a plea of double jeopardy.

172 W.Va. at 304, 305 S.E.2d at 260 (citations omitted). With these standards in mind, the parties' arguments will be considered.

## III.

### DISCUSSION

#### A. Pretrial Taint Hearing

■ The appellant first contends that the circuit court erred by denying his motion for a pretrial taint hearing to determine the reliability of the victims' testimony. Based on an expert opinion by Dr. Fred Krieg, a clinical psychologist, the appellant argues that the pretrial statements and interviews of the victims were the result of suggestive questioning and coaching by the children's mother. In support of his motion, the appellant relied upon *State v. Michaels,* 136 N.J. 299, 642 A.2d 1372 (1994), a New Jersey case which established a procedure in that State for reviewing the reliability of testimony from child witnesses.

*Michaels* involved a nursery school teacher who was convicted of sexually abusing many of the children entrusted to her care. The majority of the evidence introduced at trial against the defendant consisted of pretrial statements that had been elicited from the alleged child victims during the course of the State's investigation. On the appeal, the *Michaels* Court reversed the defendant's convictions finding that the interrogations of the alleged child abuse victims were improper. The *Michaels* Court ruled that if the State wished to retry the defendant, it would be required to be proved by clear and convincing evidence at a pretrial hearing that the children's statements and testimony retained a sufficient degree of reliability to warrant admission at trial. In the case at bar, the appellant contends that the trial court should have held a pretrial hearing like the one required in *Michaels* to determine the reliability of the testimony and statements made by B.S. and N.S.

---

4. West Virginia Code § 61–8B–7, in part, provides:

 (a) A person is guilty of sexual abuse in the first degree when:

  (1) Such person subjects another person to sexual contact without their consent, and the lack of consent results from forcible compulsion;

The State maintains, however, that the appellant's argument that the circuit court should have allowed a pretrial taint hearing based upon *Michaels* is without merit. The State first points out that there is no statutory provision, case law, or court rule that allows for such a hearing. The State further asserts that such a hearing was unnecessary in this case as all of the interviews of the children were audiotaped and presented to the jury. Moreover, Dr. Krieg testified extensively at trial on behalf of the appellant and opined that improper methods of questioning were used during the interviews of the victims. Thus, the appellant was permitted to present evidence to the jury concerning the reliability of the victims' statements.

This Court's analysis will begin by considering the New Jersey Supreme Court's decision in *Michaels*. A review of that case reveals that "[t]he interrogations undertaken in the course of [that] case utilized most, if not all, of the practices that are disfavored or condemned by experts, law enforcement authorities and government agencies." 136 N.J. at 313, 642 A.2d at 1379. Unlike the case at bar, the circumstances of *Michaels* were extreme and flagrant by any reasonable standards of reliability. For example,

The initial investigation giving rise to defendant's prosecution was sparked by a child volunteering that his teacher, "Kelly," had taken his temperature rectally, and that she had done so to other children. However, the overwhelming majority of the interviews and interrogations did not arise from the spontaneous recollections that are generally considered to be most reliable. Few, if any, of the children volunteered information that directly implicated defendant. Further, none of the child victims related incidents of actual sexual abuse to their interviewers using "free recall." Additionally, few of the children provided any tell-tale details of the alleged abuse although they were repeatedly prompted to do so by the investigators. We note further that the investigators were not trained in interviewing young children. The earliest interviews with children were not recorded and in some instances the original notes were destroyed. Many of the interviewers demon-

strated ineptness in dealing with the challenges presented by pre-schoolers, and displayed their frustration with the children.

136 N.J. at 313–14, 642 A.2d at 1379. (Citations and footnotes omitted). The *Michaels* Court further explained:

Almost all of the interrogations conducted in the course of the investigation revealed an obvious lack of impartiality on the part of the interviewer. One investigator, who conducted the majority of the interviews with the children, stated that his interview techniques had been based on the premise that the "interview process is in essence the beginning of the healing process." He considered it his "professional and ethical responsibility to alleviate whatever anxiety has arisen as a result of what happened to them." A lack of objectivity also was indicated by the interviewer's failure to pursue any alternative hypothesis that might contradict an assumption of defendant's guilt, and a failure to challenge or probe seemingly outlandish statements made by the children.

136 N.J. at 314, 642 A.2d at 1379–80. The *Michaels* Court also found that:

The record is replete with instances in which children were asked blatantly leading questions that furnished information the children themselves had not mentioned. All but five of the thirty-four children interviewed were asked questions that indicated or strongly suggested that perverse sexual acts had in fact occurred. Seventeen of the children, fully one-half of the thirty-four, were asked questions that involved references to urination, defecation, consumption of human wastes, and oral sexual contacts. Twenty-three of the thirty-four children were asked questions that suggested the occurrence of nudity. In addition, many of the children, some over the course of nearly two years leading up to trial, were subjected to repeated, almost incessant, interrogation. Some children were re-interviewed at the urgings of their parents.

136 N.J. at 314–15, 642 A.2d at 1380.

Additionally, the *Michaels* Court explained that the record of the investigative inter-

views disclosed the use of mild threats, cajoling, and bribing. Moreover, positive reinforcement was given to children who made inculpatory statements, whereas negative reinforcement was expressed when children denied being abused or made exculpatory statements. The children were also introduced to the police officer who had arrested the defendant and were shown the handcuffs used during her arrest and mock police badges were given to the children who cooperated. The *Michaels* Court explained that:

> Throughout the record, the element of "vilification" appears. Fifteen of the thirty-four children were told, at one time or another, that Kelly was in jail because she had done bad things to children; the children were encouraged to keep "Kelly" in jail. For example, they were told that the investigators "needed their help" and that they could be "little detectives." Children were also introduced to the police officer who had arrested defendant and were shown the handcuffs used during her arrest; mock police badges were given to children who cooperated.

136 N.J. at 315, 642 A.2d at 1380. Moreover, no effort was made to avoid outside information that could influence and affect the recollection of the children. As noted by the Appellate Division, the children were in contact with each other and, more likely than not, exchanged information about the alleged abuses. [*State v. Michaels* ] 264 N.J.Super. [579] at 629, 625 A.2d 489 [ (1993) ]. Seventeen of the thirty-four children were actually told that other children had told investigators that Kelly had done bad things to children. In sum, the record contains numerous instances of egregious violations of proper interview protocols.

*Id.*

Given this overwhelming evidence, the *Michaels* Court agreed with its Appellate Division that the interviews of the children were highly improper and employed coercive and unduly suggestive methods. The *Michaels* Court specifically found that "a substantial likelihood exists that the children's recollection of past events was both stimulated and materially influenced by that course of questioning." *Id.* Therefore, the *Michaels* Court concluded that a hearing "must be held to determine whether those clearly improper interrogations so infected the ability of the children to recall the alleged abusive events that their pretrial statements and in-court testimony based on that recollection are unreliable and should not be admitted into evidence." 136 N.J. at 315–316, 642 A.2d at 1380.

Having thoroughly examined *Michaels*, it is clear that the circumstances of that case are extraordinary and are substantially distinguishable from the situation before this Court in the appellant's case. For example, in *Michaels*, the complaining witnesses were all preschoolers, whereas B.S., the first granddaughter to come forward against the appellant was just under twelve years old, while the second child to make sexual abuse allegations against the appellant, N.S., was fifteen years old. Moreover, B.S.'s initial statement was spontaneous and she recounted the same abuse to her friend, a school counselor, her mother, a CPS worker, and to the police. Soon thereafter, the appellant was indicted and later convicted of five counts of sexual abuse by a custodian and two counts of first degree sexual abuse. In *Michaels*, the teacher was initially charged with a three count indictment involving the alleged abuse of three boys. However, following two more months of extremely coercive interviews of the children, a second indictment was returned containing 174 counts of various charges involving 20 boys and girls. Four months later a third indictment of fifty-five counts was added against that defendant.

In addition, in the case at hand, N.S. came forward after her mother asked her whether she had something to say about her grandfather. In the *Michaels* case, there was evidence that the complaining witnesses's statements were the result of bribery or coercion as the children were given presents to influence the content of their statements. Furthermore, unlike the situation in *Michaels*, the interviews of the two victims in this case were recorded and the investigative notes were not destroyed. There is no evidence that the interviewers

demonstrated frustration with the victims based upon their answers during the interviews nor is there evidence of a lack of impartiality by the interviewers. Likewise, the record is not replete with evidence that the victims were asked blatantly leading questions, the victims were not re-interviewed at the urging of their parents, and the victims were not subjected to repeated, almost incessant, interrogation. As such, the appellant's contention that his situation is analogous to the facts of *Michaels* is completely without merit.

Furthermore, despite the appellant's vigorous reliance on *Michaels*, it is apparent that the majority of jurisdictions that have considered *Michaels* have not adopted its holding. For example, in *State v. Karelas*, 28 So.3d 913 (Fla.App. 5 Dist.2010), the Florida appellate court explained:

> In holding as we have, we have carefully considered *State v. Michaels*, 136 N.J. 299, 642 A.2d 1372 (1994), upon which the trial court placed significant reliance. There, the court established a procedure for excluding a child witness's testimony unless the state can establish that the suggestive interview did not affect the witness's ability to testify truthfully. Like the majority of jurisdictions that have considered *Michaels*, we reject its conclusion. *See, e.g., People v. Montoya*, 149 Cal.App.4th 1139, 57 Cal.Rptr.3d 770, 778 (2007) (rejecting *Michaels*); *State v. Michael H.*, 291 Conn. 754, 970 A.2d 113 (2009) (noting that a majority of jurisdictions have rejected *Michaels*); *State v. Ruiz*, 141 N.M. 53, 150 P.3d 1003, 1008 (2006) (rejecting *Michaels'* "novel approach"); *State v. Olah*, 146 Ohio App.3d 586, 767 N.E.2d 755, 760 (2001) (rejecting *Michaels* and requirement for pretrial "taint hearing"); *State v. Bumgarner*, 219 Or.App. 617, 184 P.3d 1143 (2008) (*rejecting Michaels* "approach"). The fact that suggestive questions might have been posited is only one factor that bears on the reliability of the testimony. We conclude that the reliability of the victim's testimony can only be properly assessed after a trial on the merits during which the trier of fact may consider all of the facts and circumstances.

Moreover, in *People v. Montoya*, 149 Cal. App.4th 1139, 1149, 57 Cal.Rptr.3d 770, 778 (2007), a California Court of Appeal rejected *Michaels*, stating:

> Appellant cites no authority and we can find none that approves or requires *Michaels*-style taint hearings in California. Like other states, we reject *Michaels* in favor of our well-established competency jurisprudence. The relevant determination in California is whether a minor victim is competent to testify.

The court explained, "[t]he capacity to perceive and recollect is a condition for the admissibility of a witness's testimony on a certain matter, rather than a prerequisite for the witness's competency." *Id.* at 1150–57, 57 Cal.Rptr.3d at 778–79. In *State v. Olah*, 146 Ohio App.3d 586, 591–92, 767 N.E.2d 755, 759–60 (2001), the Ohio appellate court concluded that: "No Ohio appellate court has either followed *Michaels* or independently determined that a pretrial taint hearing is required if a child witness is potentially contaminated." Similarly, in *United States v. Geiss*, 30 MJ 678, 681 (1990), the U.S. Air Force Court of Military Review also declined to follow *Michaels* and held that: "We hold that evidence of suggestive questioning or coercive pretrial interviews goes to the credibility of a witness rather than to the admissibility of testimony."

In *State v. Bumgarner*, 219 Or.App. 617, 184 P.3d 1143 (2008), the Oregon Court of Appeals provided:

> We, too, reject the *Michaels* approach, for three reasons. First, as the *Michaels* court explained, its creation of a taint hearing procedure to determine the competency of child witnesses was based on the United States Supreme Court's eyewitness identification jurisprudence. Yet, neither that Court nor the Oregon Supreme Court has extended the need for a pretrial determination of reliability for due process purposes beyond the narrow setting of eyewitness identification. *See State v. Classen*, 285 Or. 221, 590 P.2d 1198 (1979) (citing United States Supreme Court cases on exclusion of improperly obtained eyewitness identifications). We see no reason to accord a second category of evidence the

extraordinary treatment that courts have given to eyewitness identification testimony. Indeed, even the *Michaels* court described its extension of eyewitness identification principles into the child witness area as "extraordinary." *Cf. Rock v. Arkansas,* 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987) (in rejecting state rule that barred defendant's posthypnosis testimony in all cases, Court noted that "[a] State's legitimate interest in barring unreliable evidence does not extend to per se exclusions that may be reliable in any individual case").

219 Or.App. at 633, 184 P.3d at 1151. The *Bumgarner* Court further explained:

Second, the *Michaels* court conflated the competency of the witness with the reliability of potential testimony that the witness might give. As noted above, *Michaels* rests on an analogy to tainted eyewitness testimony. Yet, even in that context, the court gave special treatment to a type of evidence, not a type of witness. Whether a category of evidence is so unreliable that its admission would violate due process is a different question from whether a witness meets the very liberal standards for competency that the evidence code (and due process) contemplates. Even if some of a witness's testimony could have been affected by the use of improper interviewing techniques, it does not follow that the witness-in all respects-cannot testify truthfully, cannot recall events, or cannot relate them. The United States Supreme Court has never suggested that evidence of taint is relevant to witness competency.

*Id.* Finally, the *Bumgarner* Court concluded that, "we believe that the trier of fact, rather than the judge, is in the best position to determine the effect, if any, of improper interviewing techniques on a witness's credibility." It explained that "[i]t is axiomatic that determination of witness credibility is normally for the trier of fact and, as we said in [*State v.*] *Lantz,*

'Whether a person, who has the ability to perceive an event, recall it and relate the recollection will tell the truth is to be tested by cross-examination and not by a

motion to disqualify the witness as incompetent. The competency inquiry should be made with a view to the preference toward allowing the trier of fact to be the ultimate judge of the quality of the evidence. 44 Or.App. [695] at 700, 607 P.2d 197 [ (1980) ].' "

219 Or.App. at 633, 184 P.3d at 1151–52.

■ In the present case, as previously discussed, the appellant does not suggest that the two victims lacked the capacity to see and recollect what happened to them. Instead, he claims that their testimony is potentially the product of suggestive and leading questioning which may have planted false memories in their subconscious. Thus, the issue is not whether the victims are competent to testify; rather, the issue is whether their testimony is reliable. It is a matter of the credibility of the witnesses and this Court has long held that credibility determinations are made by the jury. As this Court said in Syllabus Point 1 of *State v. Harlow,* 137 W.Va. 251, 71 S.E.2d 330 (1952), "[i]n the trial of a criminal prosecution, where guilt or innocence depends on conflicting evidence, the weight and credibility of the testimony of any witness is for jury determination." *See also State v. Ladd,* 210 W.Va. 413, 425, 557 S.E.2d 820, 832 (2001) ("Our rule says that credibility determinations are for the jury[.]"); *Williams v. Precision Coil, Inc.,* 194 W.Va. 52, 59, 459 S.E.2d 329, 336 (1995) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [.]").

Here, the appellant introduced extensive expert testimony regarding the claimed deficiencies in the interviews of the two victims and the jury was able to take that testimony into account in evaluating the victims' in-court and out-of-court statements. More specifically, jurors heard Dr. Krieg opine that both CPS and the Dunbar Police Department used improper methods of questioning and that the interviews of the victims were too short, that the victims' mother was present during the interviews, that the questioners used leading questions, and that there was a lack of follow up by the interviewers. This Court notes that Dr. Krieg

offered his opinions based solely upon unofficial transcripts of the CPS and Dunbar Police interviews, he did not listen to the victims' in-court testimony, and he did not listen to the actual recordings of the victims' interviews. Nonetheless, all of the alleged errors discussed by Dr. Krieg were thoroughly explored during the trial yet the jury chose to convict the appellant.

In considering all the above, this Court concludes that requiring circuit courts to hold pretrial taint hearings in every case involving a sexual abuse victim would necessarily lead to a host of new issues on appeal and would more than likely become an abused discovery tool for a defendant accused of such a crime. Even the far-reaching *Michaels* decision recognized that "assessing reliability as a predicate to the admission of in-court testimony is a somewhat extraordinary step." 136 N.J. at 316, 642 A.2d at 1381. We see no reason to subject victims of sexual abuse to a new and unnecessary layer of interrogation that is unlikely to yield any positive results. Sexual abuse victims are often children who are more likely to experience short-term and long-term consequences such as behavioral problems; social withdrawal; personality and/or substance abuse disorders; depression; and psychiatric problems. Questions surrounding the techniques of interviewers can properly and adequately be dealt with during cross-examination at trial as "[c]ross examination is the fundamental test of the reliability of testimony in our system of justice." *State v. Cook*, 175 W.Va. 185, 200, 332 S.E.2d 147, 162 (1985). Moreover, a prosecution that employs unfair and deceptive techniques does so at its own peril as defendants will be able to challenge such techniques in the presence of a jury and thus weaken or completely destroy a prosecution's case.

■ Thus, the circuit court did not commit reversible error by denying the appellant's motion for a pretrial taint hearing as set forth in *Michaels*. As the Supreme Court of

Connecticut explained in *State v. Michael H.*, 291 Conn. 754, 765, 970 A.2d 113, 121 (2009), "[t]he majority of jurisdictions have rejected the *Michaels* approach on the ground that existing procedures that address the competency and credibility of witnesses are adequate to deal with concerns regarding child testimony." Likewise, our existing procedures concerning the credibility of witnesses is also sufficient. As such, this Court now holds that assuming it otherwise meets the requirements of admissibility, the reliability of a child's testimony is properly a matter for assessment by the trier of fact who is charged with making determinations regarding the weight and credibility of such testimony. As the Supreme Court of the United States stated in *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), "[w]e are content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill." Accordingly, this Court affirms the circuit court on this issue.

### B. 404(b) Evidence

■ The appellant next argues that the circuit court erred by not granting a mistrial when B.S. testified about counts in the indictment that had been dismissed. Specifically, B.S. testified as follows:

Q. All right. What about your grandparents, Gene and Lee Ann? Are you close to them now?

A. No. Sir.

Q. Why is that? Do you know?

A. Because my grandfather hurt me and my two sisters.

Q. How do you mean he hurt you? What do you mean?

A. He molested me and my two sisters, N.S., and A.S.

The appellant contends that this testimony violated Rule 404(b) of the West Virginia Rules of Evidence and therefore, his motion for a mistrial should have been granted.[5]

5. Rule 404(b) of the West Virginia Rules of Evidence provides:

Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to

He argues that he could not have received a fair trial when the entire jury heard about alleged "other" bad acts.[6] The appellant maintains that it is clear that the evidence impacted the jury, influenced their credibility assessments of the witnesses, and foreclosed the possibility of acquittal just moments after the State's case-in-chief began. Accordingly, the appellant argues that the circuit court erred by not granting a mistrial.

Conversely, the State asserts that the circuit court was not in error when it did not grant the appellant's motion for a mistrial. The State maintains that a single blurt-out from one witness during a two-day trial, in which both victims testified about extensive sexual abuse at the hands of the appellant, did not render the trial fundamentally unfair. Furthermore, the State contends that the prosecutor was not attempting to introduce Rule 404(b) evidence. He was simply questioning the victim about whether she was close to her grandparents, at which point she mentioned that the appellant had molested both of her sisters. The State argues that following the defendant's objection, and after a bench conference, the prosecutor cured the witness's statement by clarifying that she had no knowledge of any abuse perpetrated by the appellant toward anyone other than herself. The prosecutor asked: "[B.S.], first off, you only have actual knowledge of anything happening to you only is that right?" The victim answered, "Yes, sir." Next, the prosecutor asked: "That's the only thing you've ever witnessed, right?" to which the victim responded by nodding affirmatively. Moreover, toward the end of her testimony, and far removed from the victim's brief comment regarding her two sisters, the circuit judge instructed the jury that: "witnesses can only testify about matters that they have direct knowledge about. That they have been [sic] seen, observed or been a part to.

So you should disregard any testimony concerning any events of other people."

Our review of this matter does not indicate any abuse of discretion by the circuit court, nor do we find that the circuit court acted in an arbitrary or irrational manner in denying the appellant's motion for a mistrial. The appellant's assertion that the jury could not move past B.S.'s brief and unsolicited comment is not supported by the record. During a two-day trial, the prosecution presented significant evidence of the appellant's abhorrent behavior toward his two granddaughters. Jurors heard that the appellant repeatedly touched one of his granddaughter's breasts and vagina which he penetrated with his finger. They learned that these acts occurred during the time when she was between twelve and fourteen years old. The jurors further learned that the appellant forced her to touch his penis with both hands and her mouth and that he would ejaculate on her face. Jurors then heard that this same granddaughter had survived cancer just prior to the beginning of the appellant's sexual abuse of her. Next, the jurors learned that with regard to a second granddaughter, the appellant's sexual abuse of her occurred every other weekend for approximately two years. Jurors then listened to that granddaughter explain that she was afraid of the appellant and that he touched her vagina and breasts with his hands and that he placed her hand on his penis. Finally, jurors heard from Robert Love, a man who attended church with the appellant prior to the appellant's conviction. Mr. Love testified that on one occasion as the two of them were standing in the church parking lot, just prior to church services beginning, the appellant admitted his guilt to him in the underlying crimes when he said, "If [the victims] forgave me like they said they forgave me, why am I going through this? Why is this not closed? Why is this case not closed if

---

show that he or she acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause

shown, of the general nature of any such evidence it intends to introduce at trial.

6. As previously discussed, in addition to B.S. and N.S., their younger sister, A.S., was also named as a victim. However, prior to trial, the two counts of the indictment involving A.S., were dismissed by the State.

[the victims] forgave me? Why do I have to put up this money for a lawyer?"

The appellant has failed to show a manifest necessity for a mistrial as there is no evidence of prosecutorial overreaching. Moreover, the appellant specifically declined a curative instruction at the end of the trial. As this Court has held, "[t]he determination of whether 'manifest necessity' that will justify ordering a mistrial over a defendant's objection exists is a matter within the discretion of the trial court, to be exercised according to the particular circumstances of each case." Syllabus Point 3, *Porter v. Ferguson,* 174 W.Va. 253, 324 S.E.2d 397 (1984). Given the flexibility afforded trial judges in this area, there is no evidence that the circuit court abused its discretion in denying the appellant's motion for a mistrial.

## IV.

### CONCLUSION

Accordingly, for the reasons stated above, the final order of the Circuit Court of Kanawha County entered on November 13, 2008, is affirmed.

Affirmed.