# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 18-0164** (Jefferson County 17-F-19)

**Brian O'Neil Gifft,**
**Defendant Below, Petitioner**

**FILED**

**November 8, 2019**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

## MEMORANDUM DECISION

Petitioner Brian O'Neil Gifft, by counsel Michael Santa Barbara, appeals the January 24, 2018, order of the Circuit Court of Jefferson County sentencing him to a life term of incarceration with mercy following a first-degree murder conviction by jury. The State of West Virginia, by counsel Robert L. Hogan, filed a response. On appeal, petitioner argues that his conviction is not supported by the evidence below.

The Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In January of 2017, petitioner was indicted on one count of first-degree murder. The circuit court held two pretrial hearings in December of 2017 and then commenced a jury trial on December 11, 2017. During the trial, testimony showed that petitioner attended a party in Jefferson County, West Virginia, in May of 2016. The victim arrived at the party and was met with animosity from the property owner, Mr. Dillow, and his son. Mr. Dillow argued with the victim and escorted him off of the property and back to the road with the help of his son. Petitioner then joined in the argument between the victim and Mr. Dillow and struck the victim. The three men attacked the victim, but the victim thwarted the attempts of Mr. Dillow and his son and bloodied petitioner's face. During this altercation, petitioner's gun fell from his person and was recovered by one of the witnesses. This witness, Mr. Fuston, started to leave the scene of the fight and intended to take the gun inside a nearby home when he was stopped by petitioner's brother, Mr. Gifft, who noticed petitioner's injuries and began asking Mr. Fuston questions. Quickly, petitioner came to Mr. Fuston and demanded, "give me my shit." At this time, Mr. Fuston observed the victim to be 200 or 300 feet from their location and walking away from the scene of the fight.

1

Mr. Fuston testified that he refused to hand over the gun and discouraged petitioner from further violence, stating, "it's your life man . . . not just his. It's your life." However, petitioner's brother threatened Mr. Fuston by pressing a hard object concealed by his shirt against Mr. Fuston's chest. Following this threat, petitioner reached into Mr. Fuston's back pocket and retrieved the gun. At this time, Mr. Dillow was escorting the victim back to the Dillow home and petitioner. Once petitioner retrieved the gun, he headed towards the victim. Petitioner "put his arms . . . behind [the victim] around his head and [held] the gun to [the victim's] head." Mr. Fuston could hear petitioner telling the victim to apologize to Mr. Dillow, to which the victim responded that he would not apologize for something he did not do. Petitioner asked "five or six" times for an apology then stated, "fuck it." Petitioner fired a shot into the victim's head, and, after the victim fell to the ground, petitioner stood over his body and fired a second shot into his head. Petitioner left the scene after the shooting. Four other eye witnesses corroborated these details. Three days after the shooting, petitioner turned himself in to law enforcement.

Many of these witness described petitioner's vacant expression and testified that he "wasn't there" at the time of the shooting. Indeed, Mr. Fuston testified that petitioner "just stared at" him when he initially refused to return petitioner's gun. Another eye witness testified that petitioner made eye contact with her after the shooting "and he kept walking down the road, like, you know, just like nothing happened." This witness felt as though petitioner "look[ed] right through" her. Petitioner's brother's testimony further corroborated statements that petitioner appeared not to be mentally present during the shooting, stating that he went to talk to petitioner, but "[h]e wasn't in there. It wasn't him." Petitioner's brother further recalled petitioner's eyes "were pitch black . . . . [t]he whole eye, there was no white in his eyeball" and testified that he tried to warn petitioner not to "do it" and attempted to take petitioner's gun. However, petitioner responded with resistance and did not heed his brother's warning.

At trial, petitioner called a witness qualified as an expert in the field of mental health counseling. This witness conducted a mental status examination of petitioner and testified that petitioner experienced post-traumatic stress disorder following multiple violent encounters, had a severe history of alcohol abuse, and suffered from an organic brain injury. The witness explained that post-traumatic stress disorder could result in "disassociation" during which a person would be "not really in touch with reality" and "might respond [to outside stimuli] in a very uncharacteristic disjointed way." Ultimately, the expert opined that, the day of the shooing, petitioner "was totally incapacitated and could not have planned or intended or acted under his own control" due to an episode of disassociation coupled with his alcohol intoxication. Accordingly, the witness testified that petitioner was unable to deliberate, premediate, or form intent or malice prior to the shooting. On cross-examination, the witness indicated that her opinion was formed during two meetings with petitioner and review of a psychological report performed by a court-ordered psychiatrist; however, the witness did not have access to, and did not review, petitioner's medical records, police reports, or witness statements.

In rebuttal, the State called as a witness a court-ordered psychiatrist who was qualified as an expert in forensic psychiatry. The psychiatrist testified that he was able to review petitioner's medical records, the police reports, and witness statements and conduct an in-person interview with petitioner before preparing a psychological report. Based on this information, the psychiatrist

2

opined that petitioner was "not under the influence of any psychiatric illness that would have made him incapable of conforming his behavior to the requirements of the law." Accordingly, the psychiatrist believed petitioner could form the requisite intent to murder the victim and premediate and deliberate on his actions prior to the shooting. Further, the psychiatrist critiqued the defense's expert's report and expressed serious concerns in that expert's inability to review the related medical and police records. Additionally, the psychiatrist noted that petitioner's scores on a test performed by the defense's expert indicated that petitioner was malingering, but the expert's report incorrectly interpreted the test results as non-malingering. Finally, the psychiatrist disagreed that petitioner's actions were consistent with a person suffering from post-traumatic stress disorder because a person suffering from that disorder would be more likely to avoid violent activity.

Ultimately, the jury found petitioner guilty of first-degree murder and recommended mercy. In January of 2018, the circuit court sentenced petitioner to a life term of incarceration with mercy. Petitioner now appeals the circuit court's January 24, 2018, order.

On appeal, petitioner argues that the evidence produced at trial could not support the essential elements of first-degree murder. Specifically, petitioner argues the jury could not find that petitioner premeditated, deliberated, and intended to kill the victim. Petitioner asserts that the "evidence presented at trial demonstrated that in the few, short minutes of confrontation, [petitioner] acted like an automaton, not . . . thinking, or planning, but simply reacting." Petitioner argues that the jury's verdict is clearly against the weight of this evidence. Upon review, we find that petitioner is entitled to no relief on appeal.

Regarding a claim that the evidence at trial was insufficient to convict, this Court has stated that

> [t]he function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995). Further,

> [a] criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Id.* at 663, 461 S.E.2d at 169, syl. pt. 3, in part.

In regard to the crime of first-degree murder, this Court has held "[w]here there has been an unlawful homicide by shooting and the State produces evidence that the homicide was a result of malice or a specific intent to kill and was deliberate and premeditated, this is sufficient to support a conviction for first degree murder." Syl. Pt. 3, *State v. Hatfield*, 169 W. Va. 191, 286 S.E.2d 402 (1982). Additionally,

> [a]lthough premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.

*Guthrie*, 194 W. Va. at 664, 461 S.E.2d at 170, syl. pt. 5. "In this sense, murder in the first degree is a calculated killing as opposed to a spontaneous event." *Id*. at 674, 461 S.E.2d at 180.

Applying this reasoning to the facts of this case, a rational trier of fact could find that petitioner formed the specific intent to kill the victim upon premeditation and deliberation. Here, petitioner lost his firearm while fighting with the victim. Following the fight, petitioner approached Mr. Fuston, who retrieved the weapon, and demanded the gun. During this brief encounter, Mr. Fuston discouraged petitioner from further violence. As petitioner returned to the victim's location, petitioner's brother discouraged petitioner from further violence. Yet, petitioner restrained the victim and pressed a loaded gun to his head. Finally, after multiple demands for an apology, petitioner shot the victim once in the head and then a second time after a brief pause. Although the record does not provide an exact length of time during which these events transpired, a rational trier of fact could find petitioner's actions were premeditated and deliberate. In viewing these events in a light most favorable to the prosecution, petitioner could have formed the intent to kill and reflected upon it between his walk to collect his firearm, while hearing the multiple discouraging remarks from his brother and friend, during his walk back to the victim, while making multiple demands for an apology from the victim, or just prior to firing a second shot at the victim as he lay on the ground. Moreover, the circuit court provided an instruction to the jury below based on this Court's fifth syllabus point in *State v. Jenkins*, in which we held:

> In a homicide trial, malice and intent may be inferred by the jury from the defendant's use of a deadly weapon, under circumstances which the jury does not believe afforded the defendant excuse, justification or provocation for his conduct. Whether premeditation and deliberation may likewise be inferred, depends upon the circumstances of the case.

191 W. Va. 87, 443 S.E.2d 244 (1994) (internal citations omitted). Pursuant to this instruction, which petitioner does not challenge on appeal, the jury could infer petitioner's intent to kill from his use of a deadly weapon and based on the circumstances presented. Therefore, a rational juror could find petitioner intended to kill the victim after premeditation and deliberation.

Further, although petitioner presented evidence of his diminished capacity through his expert witness at trial, the court-ordered psychiatrist's testimony heavily criticized that expert's results and proposed a differing expert opinion on petitioner's capacity. This contradictory evidence was considered by the jury and afforded weight according to their discretion. *See* Syl. Pt. 2, *State v. Smith*, 225 W. Va. 706, 696 S.E.2d 8 (2010) ("'In the trial of a criminal prosecution, where guilt or innocence depends on conflicting evidence, the weight and credibility of the testimony of any witness is for jury determination.' Syllabus Point 1, *State v. Harlow,* 137 W.Va. 251, 71 S.E.2d 330 (1952)."). Certainly, it cannot be argued that the record when viewed on appeal contains no evidence, regardless of how it was weighed, from which the jury could find guilt beyond a reasonable doubt. Sufficient evidence was presented for a rational juror to find that petitioner intended to kill the victim after premeditation and deliberation. Accordingly, we find petitioner is entitled to no relief on appeal.

For the foregoing reasons, the circuit court's January 24, 2018, order sentencing petitioner to a life term of incarceration with mercy is hereby affirmed.

Affirmed.

**ISSUED**:  November 8, 2019

**CONCURRED IN BY**:

Chief Justice Elizabeth D. Walker
Justice Margaret L. Workman
Justice Tim Armstead
Justice Evan H. Jenkins
Justice John A. Hutchison